## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01607-CNS-STV

The ESTATE OF ABBY ANGELO;
KRISTIE ANGELO, as Personal Representative of the Estate of Abby Angelo; and
K.L., a minor, by and through his grandmother, Kristie Angelo,

Plaintiffs,

v.

The BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, a
governmental entity;
REGGIE MARINELLI, in her official capacity as Jefferson County Sheriff;
WELLPATH LLC;
CARRIE EARLE, LPN, in her individual capacity;
REBECCA STRONG, LPN, in her individual capacity;
COURTNEY SLOWEY, LPN, in her individual capacity;
NICOLE WOLF, RN, in her individual capacity; and
ESMERALDA ZIEGELMANN, RN, in her individual capacity,

Defendants.

_____

### FIRST AMENDED COMPLAINT AND JURY DEMAND
_____

Plaintiffs, by and through their attorneys Virginia Hill Butler, Matthew Cron, Felipe Bohnet-Gomez, and Siddhartha H. Rathod of RATHOD | MOHAMEDBHAI LLC, allege as follows:

## I.  INTRODUCTION

1.      On June 28, 2021, Abby Angelo, a pre-trial detainee housed at the Jefferson County Detention Facility ("JCDF"), died alone in a Special Housing Unit ("SHU") cell at age twenty-nine from a treatable heart infection.

2.      Ms. Angelo's preventable death occurred because of Defendants' deliberate indifference to her serious medical needs in violation of the Fourteenth Amendment to the United States Constitution, and other negligent conduct.

3.      Ms. Angelo was arrested on June 19, 2021. Nine days later, after Defendants systematically denied her medical care, she was dead. Ms. Angelo's condition deteriorated over the nine days while she was detained to the point where she could not walk. Defendants observed Ms. Angelo lying down in her cell for days, unable to walk, and with very concerning vital signs. Defendants ignored Ms. Angelo's declining condition, allowing Ms. Angelo's heart infection to grow and grow until it became fatal. Had Ms. Angelo gotten timely care for her heart infection, there is a strong likelihood that she would have survived and would still be with her family today.

## II. JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

5.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events and omissions alleged herein occurred within the state of Colorado.

6.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

7.      Pursuant to the Colorado Governmental Immunity Act ("CGIA"), sovereign immunity is waived for Plaintiffs' state law claims against the governmental defendants. *See* Colo. Rev. Stat. § 24-10-106(1)(b) and (e).

8.      On December 2, 2021, Plaintiffs filed a timely written notice of claim as required by the CGIA. *See* Colo. Rev. Stat. § 24-10-109.

9.      Wellpath LLC is a private company and therefore no notice of the claims against them was required under the CGIA.

### III. CERTIFICATE OF REVIEW

10.     Pursuant to C.R.S. § 13-20-602(3)(a), undersigned counsel certifies as follows:

a.      Counsel has consulted with a medical professional with expertise in the areas of the alleged negligent conduct as set forth in Plaintiffs' Complaint and Jury Demand;

b.      The medical professional who has been consulted has reviewed all known facts relevant to the allegations of negligent conduct as complained of in Plaintiffs' Complaint and Jury Demand;

c.      Based upon review of such facts, the medical professional has concluded that the filing of the claims against the Defendants does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

d.      The medical professional who has reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiffs' Complaint and Jury Demand meets the requirements set forth in C.R.S. § 13-64-401.

## IV.  PARTIES

### *Plaintiffs*

11.     The decedent, Abby Angelo, was a citizen of the United States of America and a resident and domiciliary of the State of Colorado.

12.     Plaintiff Kristie Angelo, personal representative of the Estate of Abby Angelo, was the mother of Abby Angelo, and is a citizen of the United States and a resident and domiciliary of the State of Illinois.

13.     Plaintiff K.L. is the minor son of Abby Angelo. He is represented through his legal guardian, Kristie Angelo.

### *Defendants*

14.     Defendant Board of County Commissioners of Jefferson County is the public entity responsible for Jefferson County and the JCDF. The Board of County Commissioners of Jefferson County is a proper entity to be sued under 42 U.S.C. § 1983.

15.     Defendant Jefferson County Sheriff Reggie Marinelli, in her official capacity, is the public figure responsible for Jefferson County Sheriff's Department and the JCDF. Defendant Marinelli is a proper party to be sued under 42 U.S.C. § 1983. The Board of County Commissioners of Jefferson County and Sheriff Marinelli are referred to collectively as the "Jefferson County Defendants."

16.     The Jefferson County Defendants are responsible for the oversight, supervision, and training of staff at the JCDF, including employees of Wellpath LLC. The Jefferson County Defendants are properly sued under 42 U.S.C. § 1983 with respect to the hereinafter challenged deliberately indifferent policies and practices for

4

the care and treatment of persons detained at the JCDF, as well as for the policies and practices of Wellpath LLC acting as the contractual final delegated decision makers.

17.    At all relevant times, the Jefferson County Defendants had a nondelegable duty to provide adequate medical care to inmates and detainees at JCDF. The Jefferson County Defendants are liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath LLC and its employees or contractors.

18.    Defendant Wellpath LLC ("Wellpath") is a Delaware limited liability company with its principal address located 3340 Perimeter Hill Drive, Nashville, TN 37211. At the time of the events and omissions giving rise to this lawsuit, this company contracted with the Jefferson County Defendants to provide medical services to inmates and detainees at the JCDF, and supervised and implemented such services. Further, Defendant Wellpath employed Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann.

19.    Wellpath has previously been known by several other names, including Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional Healthcare Management ("CHM"). The corporate organization, leadership, and governance of Wellpath is substantially similar to that of its predecessor companies, and for all intents and purposes, it is the same company. The customs, policies, and practices of CCS, CHC, and CHM are attributable to Wellpath as their successor in interest.

20.    At all times relevant to the subject matter of this litigation, Wellpath contracted with the Jefferson County Defendants to provide staff and medical services at JCDF. At all relevant times, Wellpath was responsible for the oversight, supervision,

and training of all of the medical staff at JCDF, including the Individual Defendants in this matter, and the medical care of inmates housed at JCDF.

21.     At all relevant times, Wellpath was acting under color of state law and performing a central function of the state.

22.     Defendant Wellpath is a private company, and neither it nor any of its employees or contractors are entitled to any immunity under the CGIA on Colorado state law claims or qualified or any other immunity on the federal law claims.

23.     At all times relevant to the subject matter of this lawsuit, Defendant Carrie Earle, LPN, was a citizen of the United States and a resident of Colorado. She was an employee of Wellpath and acted under color of state law.

24.     At all times relevant to the subject matter of this lawsuit, Defendant Rebecca Strong, LPN, was a citizen of the United States and a resident of Colorado. She was an employee of Wellpath and acted under color of state law.

25.     At all times relevant to the subject matter of this lawsuit, Defendant Courtney Slowey, LPN, was a citizen of the United States and a resident of Colorado. She was an employee of Wellpath and acted under color of state law.

26.     At all times relevant to the subject matter of this lawsuit, Defendant Nicole Wolf, RN, was a citizen of the United States and a resident of Colorado. She was an employee of Wellpath and acted under color of state law.

27.     At all times relevant to the subject matter of this lawsuit, Defendant Esmeralda Ziegelmann, RN, was a citizen of the United States and a resident of Colorado.  She was an employee of Wellpath and acted under color of state law.

28.     Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann are referred to collectively as the "Individual Defendants."

## V. FACTUAL ALLEGATIONS

### *Abby Angelo's Life*

29.     Abby Angelo was born in Illinois in 1991.

30.     She had a son, K.L., age eleven as of the filing of this Complaint and Jury Demand.

31.     Ms. Angelo loved art and was a talented artist.

32.     Ms. Angelo was very close to her mother, brother, and son. Because Ms. Angelo lived in Colorado and her son lived in Illinois, she made sure to connect with him over the phone as much as possible. Ms. Angelo always made sure to ask K.L. what he wanted to be for Halloween and to send him a costume.

33.     Ms. Angelo was a strong, determined young woman who was a hard worker.

34.     Ms. Angelo possessed an incredibly generous spirit and her death has devastated her family. Ms. Angelo's family has been deprived of a loving daughter, sister, and mother. They will miss her forever.

### *Ms. Angelo is Arrested*

35.     On June 19, 2021, at approximately 9:30 p.m., Wheat Ridge Police Department ("WRPD") officers responded to a King Soopers parking lot about a possible drug overdose.

36.     The report was for a female in a black Honda Accord who appeared to be passed out. However, the female, Ms. Angelo, was alert and spoke with the officers when they arrived.

37.     Ms. Angelo identified herself, and the officers ran her name in their system, which indicated three warrants outstanding. Ms. Angelo had warrants for Failure to Appear – Narcotic Equipment, Failure to Appear – Identity Theft, and Failure to Appear – Dangerous Drugs.

38.     The responding WRPD arrested Ms. Angelo and transported her to the JCDF.

39.     At all times relevant to this Complaint and Jury Demand, Ms. Angelo was in the custody of the Jefferson County Sheriff's Department, which operates the JCDF.

### Ms. Angelo Receives an Examination When Booked into the JCDF

40.     Ms. Angelo was booked into the JCDF at approximately 10:25 p.m. on June 19, 2021.

41.     Ms. Angelo remained in the booking hold cell for over four hours, until 2:55 a.m. on June 20, 2021.

42.     At 2:55 a.m., Ms. Angelo was transferred to Booking Cell 4.

43.     Five hours after she was transported to the JCDF, at 3:35 a.m. on June 20, 2021, Ms. Angelo was medically evaluated.

44.     Emergency Medical Technician ("EMT") Deliah Gresko performed the intake medical screening of Ms. Angelo.

45.     EMT Gresko took Ms. Angelo's vital signs. Ms. Angelo's blood pressure was 108/70, her pulse was 106, her oxygen saturation ("SpO2") was 94, her

temperature was 98.6, and she had 14 respirations per minute. SpO2 levels of 95 to 100 are normal. Ms. Angelo's SpO2 was slightly below normal levels.

46.     On her "Booking Coronavirus Intake Form," Ms. Angelo indicated that she had a fever in the past seven days. She stated, "102 – temp decrease with time 98.6°"

47.     As part of her booking, Ms. Angelo was subject to an unclothed body search.

48.     The unclothed body search would have revealed track marks on Ms. Angelo's body consistent with intravenous drug use to any reasonable observer.

49.     Ms. Angelo was likely suffering from the beginning stages of an infection at the time she was arrested and booked into the JCDF. The infection was likely in the process of spreading to her heart.

### Ms. Angelo's Health Declines From June 20 to 26 in Module 6A

50.     At 3:31 a.m., five hours after she was taken to the JCDF, Ms. Angelo was transported to Module 6A Cell 22.

51.     Ms. Angelo was housed in the COVID Observation Unit. At this time, the JCDF policy was for new detainees to enter a seven-day COVID Observation Protocol. In the COVID Observation Unit, inmates were allowed "dayroom" time individually to reduce the likelihood of COVID transmission. "Dayroom" refers to time in the module common area outside of a detainee's cell.

52.     From June 20 to June 26, 2021, Ms. Angelo's health declined rapidly and dramatically.

53.     During this time, from June 20 to June 26, Ms. Angelo was housed in Module 6A.

54.     Deputies Sadie Scott and Stephanie Whiting worked in Module 6A and were familiar with Ms. Angelo during her time in Module 6A.

55.     From June 20 to June 26, Deputy Scott did not remember seeing Ms. Angelo take dayroom time.

56.     On one occasion between June 20 to June 26, Deputy Whiting opened Ms. Angelo's door and asked her if she wanted dayroom time. Ms. Angelo either walked out of her door for a second before going back into her cell or simply shut the cell door and remained inside the cell.

57.     From June 20 to June 26, neither Deputy Scott nor Deputy Whiting saw Ms. Angelo interact or converse with any other inmates.

58.     From June 20 to June 26, Deputies Scott and Whiting saw Ms. Angelo sitting on her bed with her pants pulled down, leaning her body over and resting on her knees multiple times.

59.     From June 20 to June 26, Deputies Whiting and Scott asked Ms. Angelo multiple times if she was "okay," and Ms. Angelo responded by sitting up a little bit and saying either that she was tired or that she did not feel good.

60.     From June 20 to June 26, Deputy Whiting occasionally asked Ms. Angelo if she wanted her meal tray or to come out of her cell and take a shower, and Ms. Angelo always said no and something to the effect of, "My body hurts so bad."

61.     From June 20 to June 26, Deputies Scott and Whiting and Deputy Kassey Kalman observed that Ms. Angelo's health was declining.

62.     Ms. Angelo declined breakfast at least three times between June 20 and June 26.

63.     On June 26, 2021, Ms. Angelo told Deputy Scott that she was withdrawing from heroin.

64.     Deputy Scott had asked Ms. Angelo about heroin withdrawal before June 26, and Ms. Angelo had denied it. However, Deputy Scott had suspected Ms. Angelo used intravenous drugs and that she was in withdrawal before June 26. Deputy Scott observed bruising on Ms. Angelo's legs that she recognized were "track marks" from intravenous drug use.

### Ms. Angelo Receives Deficient Medical Care on June 25, 2021

65.     After a mental health interview with a counselor the morning of June 20, 2021, Ms. Angelo was not seen by medical staff until 4:54 p.m. on June 25, 2021.

66.     At 4:53 p.m., Ms. Angelo was moved from Module 6A Cell 22 to Module A Cell 25 due to health reasons.

67.     On June 25, 2021 at 4:54 p.m., Carrie Earle, a Licensed Practical Nurse ("LPN") saw Ms. Angelo for a sick visit.

68.     LPN Earle took Ms. Angelo's vital signs. Ms. Angelo's blood pressure was 126/76, her pulse was 133, her SpO2 was 85, her temperature was 99, and she had 16 respirations per minute.

69.     Oxygen saturation is the percent of hemoglobin that is bound to oxygen in the blood stream. Oxygen saturation is measured on a logarithmic scale. Each percent decline in oxygen saturation represents a greater decline than the preceding percent. For instance, the difference between an SpO2 of 90 and 95 is much larger than the difference between an SpO2 of 95 and 100.

70.     Eighty-eight is an inflection point on the oxygen saturation scale, representing a point where each ensuing percentage drop is highly alarming and represents even greater peril to a patient.

71.     A patient with an SpO2 of 88 or below needs to be immediately taken to the Emergency Department ("ED") at a hospital and will likely be admitted to the hospital by ED physicians. *See* CLEVELAND CLINIC, *Blood Oxygen Level*, https://my.clevelandclinic.org/health/diagnostics/22447-blood-oxygen-level (last visited June 21, 2023) ("If you're using an oximeter at home and your oxygen saturation level is 92% or lower, call your healthcare provider. **If it's at 88% or lower, get to the nearest emergency room as soon as possible**.") (emphasis added).

72.     LPN Earle made the following notes about Ms. Angelo: "Pt. lying on bed on stomach states she hasn't felt well in a few days. Her only complaint is SOB. Pt has been urinating on floor. She is able to walk to toilet and down the stairs without difficulty. Pt. waiting on covid results. No medical history noted per pt." LPN Earle also noted that Ms. Angelo denied alcohol and drug use but that her skin was "Moist/Clammy." "SOB" stands for "shortness of breath."

73.     LPN Earle gave Ms. Angelo two 500 mg tabs of acetaminophen and an albuterol inhaler.

74.     For "Routine Interventions," LPN Earle wrote "[m]onitor SPO2and [sic] vital signs until stable" and "if condition does not improve notify HCP for direction otherwise."

75.     Despite recognizing the need to monitor Ms. Angelo, LPN Earle wrote that there was no follow-up required because the issue was resolved.

76.     LPNs provide basic patient care and are supposed to work under the supervision of a Registered Nurse ("RN"), physician, or other provider. LPN Earle was not authorized to diagnose Ms. Angelo.

77.     LPN Earle was the gatekeeper to further medical care for Ms. Angelo.

78.     LPN Earle knew of and consciously disregarded a substantial risk of serious harm when she did not immediately call for Ms. Angelo to be transported to the hospital ED when she had an SpO2 of 85, an elevated heart rate, an elevated temperature, shortness of breath, and observable physical maladies such as an inability to control urination.

79.     LPN Earle's "wait and see" approach was a patently unreasonable response to the obvious risk of harm Ms. Angelo was presenting with.

80.     By failing to escalate Ms. Angelo's care, LPN Earle denied Ms. Angelo access to a medical professional competent to diagnose and treat her condition.

81.     The fact that another LPN later evaluated Ms. Angelo is irrelevant to LPN Earle's deliberate indifference towards Ms. Angelo. *See Mata v. Saiz*, 420 F.3d 745, 756 (10th Cir. 2005) ("The fact that Ms. Mata was 'assessed' by another nurse the morning after she sought medical attention from Ms. Weldon is irrelevant to Ms. Mata's cause of action against Ms. Weldon. Events occurring subsequent to Ms. Weldon's complete denial of medical care to Ms. Mata have no bearing on whether Ms. Weldon was deliberately indifferent *at the time* she refused to treat Ms. Mata.").

82.     Ms. Angelo's symptoms of an SpO2 below 88, a fever, and shortness of breath are symptoms that are so obviously alarming that even a layperson would recognize the necessity for increased medical attention.

83. Indeed, even the JCDF deputies, who are not medical professionals, were concerned about Ms. Angelo's rapidly deteriorating health.

84. As a trained medical professional, LPN Earle would have known that Ms. Angelo needed substantially more medical care, namely that she should have been immediately transported to a hospital ED.

85. Later that day, at 7:35 p.m., LPN Rebecca Strong saw Ms. Angelo.

86. LPN Strong is not a more qualified medical provider than LPN Earle.

87. Like LPN Earle, LPN Strong was not authorized to diagnose Ms. Angelo and was supposed to work under the supervision of a more qualified medical provider.

88. LPN Strong was the gatekeeper to further medical care for Ms. Angelo.

89. At 7:35, Ms. Angelo's blood pressure was 99/53, her pulse was 116, her SpO2 was 94, her temperature was 97.8, and she had 20 respirations per minute. LPN Strong wrote in her notes that "Pt is very diaphoretic, states SOB, body aches and cough. States there was a little blood in spitum." Diaphoretic means that Ms. Angelo was sweating heavily.

90. Because it was recorded in her medical chart, LPN Strong knew that Ms. Angelo had an SpO2 of 85 a few hours earlier in the day.

91. While Ms. Angelo's SpO2 had increased in the ensuing hours, LPN Strong should have called for Ms. Angelo to be transported to the hospital ED when she saw that Ms. Angelo had an SpO2 of 85 earlier in the day, shortness of breath, and an elevated heart rate. Additionally, Ms. Angelo was observably in more physical distress, reported a deterioration in her symptoms, and so it was clear to LPN Strong that Ms. Angelo's condition was not improving.

92.     Despite Ms. Angelo's deteriorating condition, LPN Strong provided no medical care whatsoever.

### Ms. Angelo Receives Deficient Medical Care on June 26 and the Morning of June 27, 2021

93.     On June 26, 2021, Ms. Angelo told Deputy Scott that she was withdrawing from heroin. Ms. Angelo did not give a specific date of her last heroin use but indicated that it was before her arrest.

94.     On June 26 at 12:21 p.m., Deputies Scott, Whiting, and Kalman attempted to move Ms. Angelo from Module 6A to Module 4A. However, Ms. Angelo felt so sick that she declined to be moved.

95.     LPN Strong took Ms. Angelo's vital signs at 7:29 p.m. on June 26, 2021. Ms. Angelo's blood pressure was 106/84, her pulse was 80, her temperature was 97.5, her SpO2 was 85, and her respirations were 24 per minute.

96.     LPN Strong made the following notes: "Difficulty getting 02 sat, painful respirations. Crackles in lungs. Contacted charge for further eval."

97.     Because it was recorded in her medical chart, LPN Strong knew that Ms. Angelo had an SpO2 of 85 on June 25.

98.     Crackles in the lungs indicate fluid and/or inflammation in the lungs.

99.     LPN Strong knew or should have known that an SpO2 of 85 and crackles in lungs are not associated with opiate withdrawal.

100.    An individual with an elevated heart rate, SpO2 below 88, and crackles in lungs needs to be sent immediately to the ED.

101.    Ms. Angelo had each of these symptoms and therefore needed to be sent to the ED.

102.    As a trained medical professional, LPN Strong knew or should have known that Ms. Angelo needed to be transported to the ED immediately based on this information.

103.    LPN Strong wrote that she "[c]ontacted charge for further eval."

104.    "Charge" refers to the nurse in charge of the medical unit.

105.    LPN Slowey was the nurse in the medical unit at that time.

106.    LPN Slowey was the same medical level as LPN Strong. LPN Slowey was not a more qualified medical professional than LPN Strong.

107.    LPN Strong knew or should have known that Ms. Angelo needed to be seen by a more qualified medical professional at a hospital, not another LPN.

108.    LPN Slowey did not see Ms. Angelo until six hours later, at 1:46 a.m. on the morning of June 27.[1]

109.    Ms. Angelo was brought to her sick call with LPN Slowey by wheelchair because she was too weak to walk.

110.    Ms. Angelo's blood pressure was 112/80, her pulse was 110, her temperature was 97.0, her SpO2 was 95, and her respirations were 16 per minute.

111.    Ms. Angelo tested negative for COVID and Influenza at this sick call.

112.    LPN Slowey noted in Ms. Angelo's sick call that the "USV floor nurse reports O2 reading low[.]"

113.    LPN Slowey recorded: "Patient is brought to medical via wheelchair and states 'I don't feel good' she has c/o SOB, body aches, and cough (patient did not cough entire time in medical). Skin is warm and dry to touch, color appropriate to

ethnicity. HRRR no murmurs, rubs, or gallops noted. Dorsalis pedis and radial pulses 2+, equal bilaterally. Cap refill <2 seconds in all digits. LCTA, breathing is even and unlabored, oral mucosa and nail beds are free from cyanosis."

114.   LPN Slowey noted that Ms. Angelo was complaining of shortness of breath, general malaise, and that she was achy. When LPN Slowey took swabs of Ms. Angelo's nose, "there was a scant amount of dried blood present." Ms. Angelo indicated to LPN Slowey that she had been experiencing these symptoms for a week.

115.   Ms. Angelo denied drug use to LPN Slowey, but LPN Slowey noted that Ms. Angelo "has hx of withdraw in facility."

116.   Under "Scheduled Follow-up," LPN Slowey marked, "[X] Nursing." There is no record of any follow-up care provided to Ms. Angelo despite LPN Slowey recognizing the need for it.

117.   Ms. Angelo's SpO2 had improved since she was seen by LPN Strong six hours earlier. However, two SpO2 readings below 88 two days in a row still required that Ms. Angelo be sent to the hospital ED and treated by physicians.

118.   LPN Slowey knew or should have known that Ms. Angelo needed to be sent to the ED, even though her SpO2 had temporarily improved.

119.   LPN Slowey and LPN Strong were not qualified to diagnose or treat Ms. Angelo. While LPN Strong contacted the "charge" nurse, the charge nurse was LPN Slowey, who is the same level of medical provider as LPN Strong. LPN Slowey did not contact anyone about Ms. Angelo's deteriorating condition.

---

[1] Certain record evidence suggests that this sick visit may have occurred on the evening of June 26, 2021.

120.    Neither LPN Strong nor LPN Slowey contacted a more qualified medical professional despite knowing they were not qualified to treat or diagnose Ms. Angelo.

121.    LPN Slowey made no effort to determine the cause of Ms. Angelo's condition or to ask a more qualified medical professional to examine Ms. Angelo.

122.    Because it was in her medical chart, LPN Slowey knew that (1) Ms. Angelo had SpO2 readings below 88 two days in a row; (2) Ms. Angelo had been complaining of shortness of breath for over a week; (3) there were crackles in Ms. Angelo's lungs, which indicates fluid or inflammation; (4) Ms. Angelo did not have COVID or Influenza; (5) Ms. Angelo was too weak to walk; (6) Ms. Angelo felt very sick; and (7) Ms. Angelo had been getting progressively sicker since she was detained at the JCDF.

123.    LPN Slowey knew or should have known that Ms. Angelo required follow-up care by a more qualified medical professional.

124.    LPN Slowey had no plan of care for Ms. Angelo.

125.    LPN Slowey did not treat Ms. Angelo in any way.

126.    LPN Slowey merely took Ms. Angelo's vital signs. This is not a course of treatment or plan of care.

### Ms. Angelo's Condition Deteriorates on June 27

127.    Deputies Scott and Whiting were very concerned about Ms. Angelo's health on June 27 and how it was rapidly declining. They called medical staff about Ms. Angelo twice on June 27.

128.    At 2:15 p.m. on June 27, Ms. Angelo was moved from Module 6A to SHU cell 18 due to having made suicidal statements to Deputy Scott.

129.    Deputies Scott and Whiting conducted an unclothed body search of Ms. Angelo before moving her to SHU, and Ms. Angelo's skin was very cold to the touch.

130.    Deputy Scott brought Ms. Angelo to her cell at the SHU in a wheelchair because Ms. Angelo was too weak to walk. Deputy Scott had to assist Ms. Angelo onto her bunk because Ms. Angelo could not make it on her own.

131.    When she was brought to SHU, Counselor Rayna Thomas placed Ms. Angelo on staggered suicide watch.

132.    At 3:15 p.m., Ms. Angelo had a video visit in Dayroom 3 with her best friend, Jerry Thompson. Ms. Angelo was very confused during the visit, told Ms. Thompson that she felt very sick, cried a lot, and did not understand why she was dressed in a suicide smock.

133.    Deputy Tabitha Petrakis had to help Ms. Angelo into a sitting position on her bunk because Ms. Angelo could not sit up on her own. Ms. Angelo told Deputy Petrakis, "I am in a lot of pain. I can barely move." Deputy Petrakis helped Ms. Angelo get into a wheelchair and wheeled Ms. Angelo to her video visit with Ms. Thompson. After her visit was done, Deputy Corry Powers had to wheel Ms. Angelo back to her cell. Ms. Angelo was too weak to get out of the wheelchair on her own, so Deputy Powers had to help her out of the wheelchair and onto her bunk.

134.    Each time deputies observed Ms. Angelo that afternoon, Ms. Angelo was on the lower bunk in her cell lying naked on top of her suicide blanket.

135.    At 8:04 p.m., Ms. Angelo was placed on opiate withdrawal protocol by RN Esmeralda Ziegelmann. This was the first time Ms. Angelo had been seen by a medical professional more advanced than an LPN during her entire detention at the JCDF.

136.    Ms. Angelo's symptoms of low SpO2, crackles in lungs, and shortness of breath are not symptoms of opiate withdrawal.

137.    RN Ziegelmann knew that Ms. Angelo had been exhibiting these symptoms because they were recorded in her medical chart.

138.    RN Ziegelmann took Ms. Angelo's vital signs. Ms. Angelo's blood pressure was 100/62, her pulse was 107, her temperature was 95.8, her SpO2 was 98, and her respirations were 16 per minute.

139.    A temperature of 95.8 is highly unusual. A drop in body temperature such as this is often a sign of sepsis, which can cause tissue damage, shut down organs, and lead to death. This reading should have prompted RN Ziegelmann to either re-take Ms. Angelo's vital signs to make sure they were accurate or to escalate Ms. Angelo's care.

140.    At 8:04 p.m., RN Ziegelmann filled out a Clinical Institute Withdrawal Assessment ("CIWA-Ar") score sheet for alcohol and/or benzodiazepine withdrawal. RN Ziegelmann marked Ms. Angelo as "mildly anxious" and a total CIWA-AR score of 2. A score of 0-9 indicates "[m]inimal or no withdrawal."

141.    In her comments on the CIWA-Ar, RN Ziegelmann recognized that Ms. Angelo was not experiencing alcohol or benzodiazepine withdrawal and wrote, "wrong form."

142.    At 8:04 p.m., RN Ziegelmann filled out the Clinical Opiate Withdrawal Score ("COWS") form. RN Ziegelmann noted that Ms. Angelo has a pulse between 101-20, reported difficulty sitting still but was able to, and was experiencing mild diffuse discomfort. This resulted in a COWS score of 4, which indicated mild withdrawal.

143.    At 8:04 p.m., RN Ziegelmann filled out the NDP – Withdrawal – Opiates form. For use, RN Ziegelmann wrote: "Methadone takes half of her boyfriends, unk [sic] dose for last month and half[.]" Ms. Angelo was experiencing anxiety and abdominal cramping. RN Ziegelmann checked "nursing" under the section for follow-up.

144.    At 8:04 p.m., RN Ziegelmann filled out the Opiate/Opioid Withdrawal Practitioner Order Sheet. She indicated that medical personnel should complete the COWS assessment with vital signs every 8 hours for five days. Dr. Oglinsky is listed on the form as the provider. Ms. Angelo was prescribed meclizine, loperamide, acetaminophen, and clonidine for withdrawal. However, Ms. Angelo only ever took acetaminophen and albuterol. The following is her complete list of medication administration:

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✓ | Received |
| 1 | ✗ | Refused |
| 1 |  | Absent |
| 1 | ○ | Not Given |
| ? | ? | Missing |
|  |  | Upcoming / Unsaved |
|  | ~ | Unscheduled |

## June 2021

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACETAMINOPHEN (TYLENOL)500MG 2 TAB By Mouth BID Scheduled | Archard, MD, John J | 100% | 0900 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ CAD 1 | ✓ MSM 1 | ~ | ~ | ~ |  | 100% |
|  |  |  | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ RS 1 | ✓ RS 1 | ✓ EZ 1 | ~ | ~ | ~ | 100% |
| ACETAMINOPHEN325MG 2 TAB By Mouth 0900, 1600, 2300; Opiate POR Scheduled | Archard, MD, John J | 0% | 0900 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✗ NJW | ~ | ~ |  | 0% |
|  |  |  | 1600 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A NJW | ~ | ~ |  | 0% |
|  |  |  | 2300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |  |  |
| ALBUTEROL HFA (PROAIR)8.5GM 1-2 INH By Inhalation QID PRN PRN | Archard, MD, John J | 0% | 0400 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ○ RS | ~ | ✗ EZ | ~ | ~ |  | 0% |
|  |  |  | 2300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ○ RS | ~ | ✗ EZ | ~ | ~ |  | 0% |
| CLONIDINE (HOLD if systolic < 90)0.1MG 1 TAB By Mouth 0900, 1600, 2300; Opiate POR Scheduled | Archard, MD, John J | 0% | 1600 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ? | ~ | ~ | ~ |  | 0% |
|  |  |  | 2300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ○ EZ | ~ | ~ |  | 0% |
| LOPERAMIDE2MG 2 CAP By Mouth 0900, 1600, 2300; Opiate POR Scheduled | Archard, MD, John J | 0% | 0900 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✗ NJW | ~ | ~ |  | 0% |
|  |  |  | 1600 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A NJW | ~ | ~ |  | 0% |
|  |  |  | 2300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |  |  |
| MECLIZINE25MG 1 TAB By Mouth 0900, 1600, 2300; Opiate POR Scheduled | Archard, MD, John J | 0% | 0900 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✗ NJW | ~ | ~ |  | 0% |
|  |  |  | 1600 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | NJW | ~ | ~ |  | 0% |
|  |  |  | 2300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |  |  |

145.    At 11:21 p.m., RN Ziegelmann completed a COWS form for Ms. Angelo. Her blood pressure was 100/72, her pulse was 88, her temperature was 97.5, her SpO2 was 97, and she had 14 respirations per minute. Ms. Angelo's COWS was 2, indicating mild withdrawal.

146.    Because it was recorded in her medical chart, RN Ziegelmann knew that (1) Ms. Angelo had an SpO2 of 85 two days in a row; (2) Ms. Angelo had been complaining of shortness of breath for over a week; (3) there were crackles in Ms.

22

Angelo's lungs, which indicates fluid or inflammation; (4) Ms. Angelo did not have

COVID or Influenza; (5) Ms. Angelo was too weak to walk; (6) Ms. Angelo felt very sick;

and (7) Ms. Angelo had been getting progressively sicker since she was detained at the

JCDF.

147.    RN Ziegelmann also knew that the COWS form indicated that Ms. Angelo

was in very mild or no withdrawal. RN Ziegelmann knew or should have known that mild

opiate withdrawal would not have resulted in the level of sickness that Ms. Angelo was

exhibiting.

148.    RN Ziegelmann knew or should have known that Ms. Angelo's symptoms

and vital signs were not consistent with opiate withdrawal.

**Ms. Angelo Dies Alone in Her Cell on June 28 After Medical Personnel Ignore Her**

149.    Ms. Angelo's health continued to deteriorate. She was so sick she could

not get up for breakfast the morning of June 28.

150.    At 6:40 a.m., Deputy Petrakis saw Ms. Angelo laying on the floor of her

cell on her back naked with her head under a table.

151.    Deputy Powers did 15 walkthroughs of the SHU the morning of June 28

and for each one, Ms. Angelo was lying on the bottom bunk naked and barely moving.

152.    Between 6:55 and 8:20 a.m., Deputy David O'Hanahan assisted RN

Nicole Wolf during the morning medications round. When they arrived at Ms. Angelo's

cell, she was naked. Deputy Petrakis stepped in to assist RN Wolf at this time due to

Ms. Angelo being naked.

153.    Ms. Angelo had visible track marks consistent with intravenous drug use

on her legs when RN Wolf came to Ms. Angelo's cell to take her vitals and give her

medications. When looking at Ms. Angelo, Nurse Wolf would have seen Ms. Angelo's track marks and knew or should have known they were from intravenous drug use.

154.   Deputy Petrakis asked Ms. Angelo if she wanted her medications and Ms. Angelo softly replied, "no." Deputy Petrakis asked again, and Ms. Angelo said no again and shook her head.

155.   RN Wolf wrote that Ms. Angelo was "alert and oriented so she did not force the issue, they just moved on to the next inmate." At this point, Ms. Angelo had been sick for over a week, was too weak to move, and had been laying naked on the floor of her cell for hours.

156.   RN Wolf's description of Ms. Angelo as "alert and oriented" was blatantly untrue.

157.   Because it was recorded in her medical chart, RN Wolf knew that (1) Ms. Angelo had an SpO2 of 85 two days in a row; (2) Ms. Angelo had been complaining of shortness of breath for over a week; (3) there were crackles in Ms. Angelo's lungs, which indicates fluid or inflammation; (4) Ms. Angelo did not have COVID or Influenza; (5) Ms. Angelo was too weak to walk; (6) Ms. Angelo felt very sick; (7) Ms. Angelo had been getting progressively sicker since she was detained at the JCDF; (8) the COWS form indicated that Ms. Angelo was in very mild withdrawal; and (9) Ms. Angelo was naked on the floor laying on her back barely moving and too weak to stand.

158.   Additionally, RN Wolf would have seen Ms. Angelo naked with track marks on her body from intravenous drug use.

159.   RN Wolf knew or should have known that mild opiate withdrawal would not have resulted in the level of sickness that Ms. Angelo was exhibiting.

160.   RN Wolf knew or should have known that Ms. Angelo's symptoms and vital signs were not consistent with mild opiate withdrawal.

161.   RN Wolf filled out the Refusal of Clinical Services Form. It states: "I understand there are the following risks, complication, and/or side effects involved in refusing clinical services. Describe: no therapeutic effect from medication; death[.]" The portion after "describe" was handwritten in by RN Wolf.

162.   Ms. Angelo refused to sign the form. Deputy Petrakis signed it as a witness.

163.   RN Wolf was aware that death was a possible outcome of her decision not to provide medical care.

164.   At 9:00 a.m., RN Wolf filled out a COWS form with incomplete information because she had not taken Ms. Angelo's vital signs.

165.   Deputy Powers distributed lunches. Ms. Angelo was at the cell door naked when Deputy Powers did so.

166.   Around 11:30 a.m., Deputy Petrakis collected Ms. Angelo's meal tray.

167.   After lunch, Ms. Angelo had an attorney visit scheduled. When Deputy Petrakis asked Ms. Angelo if she wanted to go to her visit, she said no.

168.   Around 1:00 p.m., Deputy Petrakis asked Ms. Angelo if she wanted dayroom or to shower, and Ms. Angelo said no.

169.   Around 4:00 p.m., Deputy Petrakis was escorting another inmate out of his cell when she walked by Ms. Angelo's cell and saw a "tiny foot movement" but nothing else.

170.    Around the same time, Deputy Powers walked by Ms. Angelo's cell and saw Ms. Angelo laying on the cell floor naked with her head towards the cell door and feet towards the lower bunk at a diagonal. Deputy Powers saw Ms. Angelo's belly moving "as if she was breathing." Deputy Powers closed Ms. Angelo's window. Ms. Angelo was never seen alive again.

171.    Shortly after 4:00 p.m., Deputy Petrakis and RN Wolf started the afternoon medication dispensation. They arrived at Ms. Angelo's cell at 4:09 p.m. Ms. Angelo was lying naked on top of her suicide blanket diagonally with her head towards the door.

172.    Ms. Angelo did not respond when Deputy Petrakis and RN Wolf said her name. They observed that her eyes and mouth were both open, her skin was pale and cold, but was soft to the touch. Ms. Angelo was not moving.

173.    RN Wolf did a sternum rub and checked for a pulse. Deputy Petrakis started cardiopulmonary resuscitation ("CPR") while RN Wolf evaluated Ms. Angelo's vital signs. Deputy Petrakis radioed that there was an unresponsive patient and additional deputies and medical personnel arrived to provide assistance. It was too little too late. At 4:41 p.m., Dr. W. Sharp pronounced Ms. Angelo dead via a telephone call. Dr. John Archard, who responded to Ms. Angelo's cell, estimated that Ms. Angelo died five to ten minutes before she was found.

174.    Ms. Angelo was 29 years old when she died.

### *Ms. Angelo's Death was Caused by a Treatable Infection*

175.    Ms. Angelo died from tricuspid valve endocarditis ("TVE"). Ms. Angelo did not die from opiate withdrawal.

176.    TVE is a heart infection. TVE is a type of endocarditis most commonly associated with intravenous drug users. Ms. Angelo was an intravenous drug user.

177.    JCDF staff knew Ms. Angelo was an intravenous drug user from the time of her intake when they conducted an unclothed body search. Ms. Angelo had visible track marks and injection sites from intravenous drug use. Additionally, medical staff knew that Ms. Angelo was a user of opiates at least as of June 27 at 8:04 p.m. when RN Ziegelmann placed Ms. Angelo on opiate withdrawal.

178.    RN Wolf would have seen Ms. Angelo naked with track marks on her body from intravenous drug use.

179.    TVE is a "cannot miss" diagnosis because it is often fatal if not treated. However, if caught early and treated properly, it has a high survival rate.

180.    A four- to six-week course of antibiotics cures most TVE. For more advanced TVE, surgery is required. Even with surgery, the prognosis for recovery is good.

181.    Ms. Angelo needed four to six weeks of intravenous antibiotics to treat her TVE. If she had received this treatment in a timely manner, Ms. Angelo would likely have survived the infection.

182.    Ms. Angelo's vital signs showed that she was suffering from TVE, not opiate withdrawal. The following is a chart of Ms. Angelo's vital signs for her whole detention:

Viewing 1-12 of 12 Flow Records

| User | Record Date | Pos | BP Sys | BP Dia | Pulse | Resp. | Temp. | Weight | Height | BMI | SpO2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wolf, RN, Nicole J | 06/28/2021 1512 | - - - | | | | | | | | | | Patient refused |
| Ziegelmann, RN, Esmeralda T | 06/27/2021 2353 | Sitting | 100 | 72 | 88 | 14 | 97.5 °F | | | | 97.0% | |
| Ziegelmann, RN, Esmeralda T | 06/27/2021 2352 | Sitting | 100 | 62 | 107 | 16 | 95.8 °F | | | | 98.0% | |
| Ziegelmann, RN, Esmeralda T | 06/27/2021 2149 | Sitting | 100 | 62 | 107 | 16 | 95.8 °F | | | | 98.0% | |
| Ziegelmann, RN, Esmeralda T | 06/27/2021 2004 | Standing | 100 | 62 | 107 | 16 | 95.8 °F | | | | 98.0% | VS CHECK; NO COMPLAINTS AT THIS TIME |
| Slowey, LPN, Courtney | 06/27/2021 0148 | Sitting | 112 | 80 | 110 | 16 | 97.0 °F | | | | 95.0% | Entered on a sick call created 06-27-2021 0137 |
| Slowey, LPN, Courtney | 06/27/2021 0146 | - - - | | | | | | | | | | see sick call |
| Strong, LPN, Rebecca A. | 06/26/2021 1929 | Standing | 106 | 84 | 80 | 24 | 97.5 °F | | | | 85.0% | Difficulty getting O2 sat, painful respirations. Crackles in lungs. contacted charge for further eval. |
| Strong, LPN, Rebecca A. | 06/25/2021 1935 | Standing | 99 | 53 | 116 | 20 | 97.8 °F | | | | 94.0% | Pt is very diaphoretic, states SOB, body aches and cough. States there was a little blood in sputum. |
| Earle, LPN, Carrie | 06/25/2021 1659 | Sitting | 126 | 76 | 133 | 16 | 99.0 °F | | | | 85.0% | Entered on a sick call created 06-25-2021 1650 |
| Earle, LPN, Carrie | 06/25/2021 1656 | - - - | | | | | | | | | | see kite |
| MUO/EMT, Gresko, EMT, Deilah | 06/20/2021 0335 | Sitting | 108 | 70 | 106 | 14 | 98.6 °F | 163 lbs | 5ft 5in | 27.10 | 94.0% | |

183.   Opiate withdrawal does not cause low SpO2, crackles in lungs, or shortness of breath.

184.   Each Individual Defendant knew or should have known that Ms. Angelo's symptoms were not consistent with opiate withdrawal.

185.   Each Individual Defendant was the gatekeeper to further medical care for Ms. Angelo.

186.   Each Individual Defendant knew of and consciously disregarded a substantial risk of serious harm when they did not immediately call for Ms. Angelo to be transported to the ED when they either took her vital signs and/or read her medical chart and saw that she had an SpO2 of 85, an elevated heart rate, an elevated temperature, and shortness of breath.

187.    Each Individual Defendant's "wait and see" approach was a patently unreasonable response to the obvious risk of harm to Ms. Angelo given her various symptoms.

188.    By failing to escalate Ms. Angelo's care, each Individual Defendant denied Ms. Angelo access to a medical professional who was competent to diagnose and treat her condition.

189.    The placement of Ms. Angelo on opiate withdrawal protocol, without evaluating her for other causes of her symptoms, was a patently unreasonable response to the obvious risk of harm Ms. Angelo was presenting with because her symptoms of low SpO2, crackles in lungs, and shortness of breath are not associated with opiate withdrawal.

### Unconstitutional Policies, Practices, and Customs
### Regarding Medical Care of Inmates at the JCDF

190.    At all times relevant to the subject matter of this Complaint and Jury Demand, the Jefferson County Defendants contracted with Wellpath to provide medical care and services to detainees at JCDF, as well as medical personnel.

191.    For at least six years before Ms. Angelo's death, Defendant Jefferson County has maintained such a contract with Wellpath (including when Wellpath was known as CHC, CCS, and/or CHM).

192.    The Jefferson County Defendants and Wellpath maintained constitutionally deficient policies and practices and neglected to adequately train and supervise their employees with respect to the proper procedures for the evaluation and treatment of JCDF detainees' and inmates' serious medical needs.

193.    The contract between the Jefferson County Defendants and Wellpath financially incentivizes reductions in the use of necessary off-site medical services for inmates, and as such, represents an unconstitutional policy which gives rise to entity liability.

194.    Under the agreement, Wellpath is contractually obligated to pay up to a certain amount of expenses for off-site medical care for each inmate.

195.    Such a provision invites reckless risk-taking to save money—it expressly offers an incentive to deliberately disregard known and excessive risks to an inmate's health or safety—including the risk that they may die or suffer without timely off-site care.

196.    The Jefferson County Defendants and Wellpath failed to adequately train and supervise the medical staff, amounting to deliberate indifference to the serious medical needs of inmates.

197.    Staff are deliberately trained not to escalate care to more qualified medical providers.

198.    It was well known by the Jefferson County Defendants and Wellpath prior Ms. Angelo's death that there was a widespread pattern and practice of deliberately indifferent medical care at JCDF, as well as other facilities at which Wellpath provided medical services.

199.    The Individual Defendants' violation of Ms. Angelo's Fourteenth Amendment right to be free from deliberate indifference to her medical needs, standing alone, is sufficient evidence of the Jefferson County Defendant and Wellpath's custom, policy, or practice of deliberate indifference because all Individual Defendants acted in

essentially the same unconstitutional manner, each adhering to what they, based upon training, knew to be standard operating procedure, policy, and customary practice.

200. But for Wellpath and the Jefferson County Defendants' highly deficient training (or lack thereof), Ms. Angelo's death could have been prevented.

201. But for Wellpath and the Jefferson County Defendants' policy, custom, or practice that medical staff did not need to treat detainee's symptoms, Ms. Angelo's death could have been prevented.

202. Wellpath and the Jefferson County Defendants' policies, customs, and practices were so far outside of the standard of care for medical professionals as to be obviously reckless to a lay person and deliberately indifferent to the known serious medical needs of detainees with TVE.

### Defendant Wellpath Has a Long History of Failing to Provide Adequate Medical Care in Detention Facilities

203. The Jefferson County Defendants and Wellpath's policy and/or custom of prioritizing financial incentives over patient care and their lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at JCDF is further evidenced by the following incidents.

204. On May 1, 2020, Paul Abeyta died while incarcerated at the JCDF as a result of complications from opioid withdrawal. Mr. Abeyta informed the detention staff that he had been a daily heroin user for the past five years and he had been suffering from symptoms including fever, cough, and shortness of breath. Mr. Abeyta was transferred to the medical unit of the jail where he was supposed to be routinely observed. Mr. Abeyta's symptoms progressed due to his withdrawals. Mr. Abeyta died in his cell after not receiving adequate medical care in response to his obvious

withdrawal symptoms while he was supposedly under "observation" in the medical unit of the jail.

205.    Between August 2019 and January 2020, Ronald Rogacki suffered an obvious oral/sinus infection that caused him painful, often inescapable headaches; purulent, foul-smelling drainage from his nostrils; hearing and vision loss; dizziness, foul breath; and other serious symptoms. Mr. Rogacki brought suit against Jefferson County, Wellpath, and his individual medical providers. *See Rogacki v. Jefferson County*, No. 21-cv-02281-CNS-KLM (D. Colo.). This case is currently in litigation.

206.    On March 28, 2019, John Kowalski also died from complications of opiate withdrawal due to JCDF and Wellpath staff's deliberate indifference to his serious medical needs, while he was a pre-trial detainee at the JCDF. *See Estate of Kowalski v. Shrader*, No. 21-cv-00827-NYW (D. Colo.). While in custody, Mr. Kowalski, suffering from opiate withdrawal, passed out and had a seizure in the shower. Mr. Kowalski's conditions were communicated to JCDF staff and Wellpath medical personnel responsible for caring for Kowalski. However, JCDF and Wellpath staff did not provide adequate medical care nor life-preserving checkups on his condition. As a result, he became gravely ill and went into cardiac arrest. He died a week later at the hospital.

207.    On March 2, 2015, Jennifer Lobato died as a result of dehydration stemming from opiate withdrawal-related complications while being detained at JCDF. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone, including vomiting profusely. Ms. Lobato's symptoms progressively worsened. JCDF staff refused to respond to provide Ms. Lobato with the medical care she needed. As a result, Ms. Lobato died alone in her cell. Ms. Lobato's estate filed suit

against several individual defendants, as well as Jefferson County and CCS. Jefferson County and the deputy defendants settled with Ms. Lobato's estate for $2.5 million prior to trial and claims against the CCS Defendants settled for a confidential amount.

208.    In 2013, Kenneth McGill sued Jefferson County and Wellpath (then known as CHC) after he was denied medical treatment at JCDF while exhibiting obvious signs of a stroke in September 2012. *See McGill v. Correctional Healthcare Companies*, No. 13-cv-01080-RBJ-BNB (D. Colo.). Mr. McGill complained to JCDF staff of dizziness, slurred words, and difficulty maintaining balance. JCDF and CHC staff, acting with deliberate indifference, failed to take Mr. McGill to a hospital in a timely fashion where he could have received necessary emergency medical care. This case went to trial and resulted in a plaintiff's verdict for approximately $11 million. The jury also found that CHC had constitutionally deficient training and supervision of nurses in the JCDF.

209.    Because Defendant Wellpath is a national company with a sordid history of failing to provide constitutionally adequate medical care to inmates at correctional facilities at which it contracts, there is an abundance of examples nationwide establishing that Wellpath and the entities that employ it have policies, customs, and practices demonstrating deliberate indifference to the medical needs and constitutional rights of inmates.

210.    A 2019 report by CNN (on Wellpath's predecessor CCS) concluded that "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees, and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [CCS] has provided substandard care that has led to deaths and other serious

outcomes that could have been avoided." The report found that "[a]cross the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. CCS employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."[2] Endless examples of such substandard and unconstitutional care exist.

211.    For example, in 2013, a multiple plaintiff case was filed against CHC-related companies arising out of three deaths and one near death in the Tulsa County Jail resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners. *See Revilla v. Stanley Glanz, Sheriff of Tulsa County*, No. 13-cv-00315-JED-TLW (N.D. Okla.). One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms. Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation was denied. The incidents were caused by a longstanding policy, practice, or custom at the jail of Wellpath's predecessor companies (CHC etc.) refusing to send inmates with emergent needs to the hospital for purely financial purposes.

212.    Earl Williams died at the Tulsa County Jail after he was known to have gone days without food or water. Mr. Williams' serious and known medical needs were

---

[2] Blake Ellis and Melanie Hicken, *A CNN investigation exposes preventable deaths and dangerous care in jails and prisons across the country*, CNN (June 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

ignored by CHC medical staff because there was an inappropriate "faking or malingering" diagnosis that prevented him from receiving timely hospital care. Expressly concluding that he was faking paralysis, the CHC nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. Before he died, staff threw food at Mr. Williams and put water just outside his reach. Mr. Williams' death was caused by CHC-related defendants' maintaining a policy, practice, and/or custom of severely limiting the use of off-site medical, mental health, and diagnostic service providers, even in emergent situations, in deliberate disregard to the known, obvious and excessive risks to the health and safety of inmates.

213.    18-year-old Marc Moreno died in 2016 in Benton County Jail (Oregon) after CCS medical staff unconstitutionally denied him medical care despite his alarming, emergent symptoms. Mr. Moreno was suffering from a known mental health crisis when he was detained, and he was observed by jail staff not eating or drinking for days. When a CCS nurse at the jail observed him, knowing that he had not had food or drink for four days at that point, she not only failed to contact a provider or send him off-site for emergency treatment, she also did not even take his vital signs. The next day, he was found dead in his cell; he had lost 38 pounds in the 8 days he had been detained. After his family sued CCS, a court found that CCS had destroyed thousands of potentially incriminating documents in the case before they could be produced. Wellpath settled the lawsuit for $4.5 million.

214.    Henry Clay Stewart died a preventable death from a perforated ulcer at Hampton Roads Regional Jail in Virginia in 2016 after seeking medical assistance from CCS medical staff for almost a month; he reported abdominal pain, blackouts, and

inability to keep down food or water. Despite his persistent, concerning symptoms, medical staff acted with deliberate indifference to his serious medical needs by refusing to send him off-site for care. A Department of Justice investigation found that there was reasonable cause to believe that the jail failed to provide inmates with constitutionally adequate medical care, citing Mr. Stewart's death, among several other deaths from lack of insufficient medical care, as evidence of its finding. The DOJ found that before Mr. Stewart slowly bled to death, medical staff ignored his complaints because they determined that he had already been seen at the hospital.

215.    Alisant Scott lost her breast to a mastectomy in 2016 after being detained in the Oakland County Jail (Michigan), where CCS medical staff denied her obviously necessary evaluation and treatment in response to her complaints of agony due to a knot in her breast growing to the size of a baseball. Ms. Scott was prescribed a basic antibiotic that medical records show did little to combat a dangerous MRSA infection inside her breast; she pleaded with medical staff for help for two weeks before being forced to undergo the mastectomy, and the unconstitutional delay in adequate care and treatment was likely the reason she lost her breast and suffered weeks of excruciating pain.

216.    In 2016, 59-year-old Paul Clifton Jr. died in an Illinois jail after a jail sergeant who was about to call an ambulance for him due to his difficulty breathing was told by CCS employees that his condition had improved and that it was unnecessary to send him out. Even though Mr. Clifton's blood pressure remained dangerously high and he complained of chest pains, CCS staff refused to call an ambulance until he was unresponsive. Mr. Clifton's death was caused by CCS medical staff's deliberate

indifference to his obvious and serious medical needs, as well as CCS's policy, custom, and/or practice of not or delaying in obtaining obviously necessary off-site care for inmates with serious medical conditions.

217.   Jeffrey Lillis died at 37 years old at the Arapahoe County Detention Facility on December 14, 2014, as a result of deliberate indifference to his known serious medical needs by, among others, a CCS/CHC/CHM-contracted physician. Mr. Lillis died of sepsis and severe bacterial pneumonia, easily treatable conditions that would not have killed him had he been provided him with proper and timely medical attention and treatment. Yet despite learning of the serious nature of his symptoms, the physician failed to timely order that Mr. Lillis be transported off-site for the necessary medical evaluations and care, leading (among other actions by jail medical staff) to Mr. Lillis's death. The state medical board later found that the doctor had acted below generally accepted standards of practice. A claim against the physician and CCS/CHC/CHM was settled by CCS/CHC/CHM for a confidential amount.

218.   In August of 2014, CHC-related defendants unconstitutionally caused the death of John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his obvious and serious medical condition. Involved staff deliberately disregarded his obvious malnourishment and dehydration and withdrawal related conditions due to the jail's and CHC's denial of the prescription medication he had been taking before he was detained, and recklessly refused to transport him to the hospital for necessary emergency treatment. He died on the floor of his cell, weighing 30 pounds less than when he was brought to the jail three weeks earlier. The lawsuit settled for $4.24 million.

219.    In April of 2014, Thomas Beauford died at the Mesa County Detention Facility due to deliberate indifference to his obvious and serious medical needs by CCS (or related companies). Throughout his time at the jail, Mr. Beauford demonstrated clear signs of epilepsy. Because of the failure to provide him adequate care, Mr. Beauford's condition rapidly deteriorated on April 15, 2014, into the morning of April 16, 2014. Though Mr. Beauford's need for immediate medical attention was obvious, at no time was he provided with medical attention or treatment. Alone in his cell, Mr. Beauford ultimately had a series of seizures, fell off of his bed, and died with his head jammed underneath his desk. Mr. Beauford's death could have undoubtedly been prevented had jail medical staff provided him with prompt and appropriate medical attention and treatment. CHC paid $400,000 and the county paid $1.6 million to settle a lawsuit against them.

220.    An investigation into David Courtney's 2014 death after his detention in Montgomery County Jail, where CCS was the medical care provider, resulted in the Texas Commission on Jail Standards finding that the jail did not meet minimum standards. The conclusion was based in part on the fact that Mr. Courtney received clearly unconstitutional care when CCS waited nearly two months to send him to see a doctor despite at least four notes in his chart about blood in his stool.

221.    On June 3, 2013, Tanya Martinez, died alone in a lockdown jail cell at the Pueblo County Detention Facility from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Martinez's preventable death occurred after she displayed obvious signs of withdrawal, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and CHC medical staff

failed to regularly monitor Ms. Martinez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her.

222.    In 2012, CCS medical staff ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell in Wichita County Jail. CCS staff recklessly failed to transport her to the hospital for safe delivery. When delivered, the baby was purplish and in need of medical attention, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

223.    A common thread in these cases is that CHC and related companies ignored obvious signs and symptoms to deny inmates access to necessary, emergent medical care.

224.    Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by Wellpath's predecessors.

225.    In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC-related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

226.    In 2008, the Department of Justice found that the jail medical program, administered by a CHC-related entity, was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature

labor and delivered a baby while handcuffed to a chair rail, after all her complaints, including that her water had broken, were ignored. The DOJ found that there were "critical lapses in getting emergency medical care to detainees." The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

227.    In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC-related companies despite the abundant notice of the same from NCCHC and DOJ.

228.    In 2010, during a NCCHC audit, high-level employees of CHC attempted to fraudulently change medical records to give the appearance of compliance. NCCHC found deficient care, deficient investigation into deaths, and lack of timely diagnostic and specialty services. Even after this audit, CHC did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health. High-level CHC workers repeatedly brought to corporate CHC attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but that the corporation refused to make any changes to the way CHC related companies do business.

229.    In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CHC's care.

230.    In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies

and reported: "CRCL found a prevailing attitude among clinic staff of indifference . . .", "Nurses are undertrained. Not documenting or evaluating patients properly."

231.    Jefferson County Defendants, in conducting any kind of due diligence when contracting with Wellpath initially and when renewing the contract to provide medical care at the JCDF, would have known of these serious issues in licensure and accreditation of Wellpath prison programs, the findings of multiple governmental agencies, and refusals by Wellpath to correct deliberately indifferent policies. Therefore, Jefferson County Defendants are liable for the selection of Wellpath to provide medical services.

232.    Jefferson County Defendants intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, Wellpath.

233.    Wellpath and Jefferson County Defendants had all of the above-described knowledge and notice prior to Ms. Angelo's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to detainees by Wellpath, as well as the widespread company policy of refusing to send inmates with emergent needs to the hospital or other off-site providers.

234.    Wellpath and Jefferson County Defendants ratified the constitutional violation by the Individual Defendants by failing to administer any discipline.

## VI.  STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Failure to Provide Medical Care and Treatment
### Fourteenth Amendment
### (Plaintiffs the Estate of Abby Angelo and Kristie Angelo as the Personal Representative of the Estate of Abby Angelo Against All Individual Defendants)

235.  Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

236.  At all times relevant to this claim, each Individual Defendant was acting under color of state law in his or her actions and inactions.

237.  Individual Defendants are persons under 42 U.S.C. § 1983.

238.  Ms. Angelo had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to her known serious medical needs.

239.  TVE is a condition that constitutes a serious medical need.

240.  The symptoms of TVE that Ms. Angelo presented with, including but not limited to shortness of breath, crackles in her lungs, emergency-level vital signs, and inability to move on her own, demonstrated that she had a serious medical need.

241.  That Ms. Angelo's medical condition was sufficiently serious is demonstrated by the observations and actions of Jefferson County deputies who repeatedly raised concerns with medical staff and documented their observations of Ms. Angelo's condition.

242.  Given that lay persons such as the deputies recognized Ms. Angelo's dire condition, each Individual Defendant – all of whom were trained medical professionals – would also have recognized Ms. Angelo's dire condition and need for medical treatment.

243. However, with deliberate indifference to Ms. Angelo's constitutional right to necessary medical care, each Individual Defendant failed to properly examine, monitor, treat, and care for Ms. Angelo. Each Individual Defendant so failed despite his or her knowledge of Ms. Angelo's serious medical needs, placing her at risk of substantial physical injury.

244. The actions and omissions of each Individual Defendant were conducted within the scope of his or her official duties and employment.

245. The actions and omissions of each Individual Defendant were the legal and proximate cause of Ms. Angelo's injuries and death.

246. The actions or omissions of each Individual Defendant caused Ms. Angelo damages in that she suffered significant physical and mental pain as she experienced a rapidly progressing infection without adequate medical treatment.

247. The Individual Defendants, through their actions or omissions as described herein, intentionally deprived Ms. Angelo of her right to be free of cruel and unusual punishment and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Failure to Provide Medical Care and Treatment
Fourteenth Amendment
(Plaintiffs the Estate of Abby Angelo and Kristie Angelo as the Personal
Representative of the Estate of Abby Angelo Against Wellpath and Jefferson
County Defendants)**

248. Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

249. Wellpath and Jefferson County Defendants are persons within the meaning of 42 U.S.C. § 1983.

250.  At all times relevant to this claim, Wellpath was acting under the color of state law, as the functional equivalent of a municipality providing medical care to inmates.

251.  At all times relevant to this claim, Jefferson County Defendants were acting under the color of state law and had a non-delegable duty to provide constitutionally adequate medical care for inmates.

252.  Wellpath and Jefferson County Defendants' deliberately indifferent policies, customs, and practices as described herein were moving forces and proximate causes of the violation of Ms. Angelo's constitutional rights.

253.  Wellpath and Jefferson County Defendants knew or should have known that their policy of providing hospital care only at last resort would result or had resulted in a pattern of not sending detainees with serious medical needs to obtain necessary emergency services.

254.  Wellpath and Jefferson County Defendants knew or should have known that their policy of not requiring escalating care to inmates whose conditions were deteriorating would result in a failure to provide inmates with medical care and treatment.

255.  Further, Wellpath and Jefferson County Defendants failed to properly train and supervise their employees to provide necessary medical care to detainees at the JCDF.

256.  Wellpath and Jefferson County Defendants knew or should have known that their failure to train and supervise their employees would cause such employees to

fail to provide necessary medical assessment and care, in violation of detainees' constitutional rights.

257.  Wellpath and Jefferson County Defendants' failure to train and supervise their employees was a moving force and proximate cause of the violation of Ms. Angelo's constitutional rights.

258.  The policies, customs, and practices of Wellpath and Jefferson County Defendants as described herein deprived Ms. Angelo of her rights, privileges, liberties, and immunities secured by the United States Constitution, and caused Plaintiffs other damages.

### THIRD CLAIM FOR RELIEF
**Medical Negligence**
**(Plaintiffs the Estate of Abby Angelo and Kristie Angelo as the Personal Representative of the Estate of Abby Angelo Against All Defendants)**

259.  Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

260.  Wellpath is a private company that contracts to provide medical care and health services to inmates at the JCDF.

261.  Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann are private individuals, and not public officials or employees.

262.  Wellpath and Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann are therefore not entitled to any immunity under the CGIA.

263.  At all times relevant to this action, Ms. Angelo was under the medical responsibility, care, and treatment of Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann.

264.  Wellpath and Jefferson County Defendants are vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to those named individually herein.

265.  Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann had a duty to provide reasonable medical care and treatment to detainees at the JCDF, including Ms. Angelo, and to exercise reasonable care in the training and supervision of their employees.

266.  These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

267.  Through their actions and omissions, Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann breached their duty of care and were negligent when they failed to adequately assess, monitor, treat, and care for Ms. Angelo.

268.  Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann had nurse-patient relationships with Ms. Angelo at all relevant times and were acting within the scope of their employment while treating Ms. Angelo.

269.  With respect to their care and treatment of Ms. Angelo, Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann owed her a duty to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.  Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann deviated from that standard of care and were negligent in failing to properly assess, monitor, treat, and care for Ms. Angelo.

270.  Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiffs.

271.  As a direct and proximate result of Defendants Earle, Strong, Slowey, Wolf, and Ziegelmann's breach of their duty to provide reasonable medical care and treatment to Ms. Angelo, she suffered significant physical and mental pain and suffering and other damages in the final days of her life, and ultimately her death.

272.  Defendants conduct has proximately caused Plaintiffs significant pain, suffering, grief, loss of comfort and society, and other damages arising from the suffering and ultimate death of Ms. Angelo.

## FOURTH CLAIM FOR RELIEF
### Negligent Training and Supervision
**(Plaintiffs the Estate of Abby Angelo and Kristie Angelo as the Personal Representative of the Estate of Abby Angelo Against Wellpath and Jefferson County Defendants)**

273.  Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

274.  Wellpath and Jefferson County Defendants had a duty to exercise reasonable care in the training and supervision of their employees and agents in a manner that provided the detainees under their care with reasonable medical care and treatment.

275.  Wellpath and Jefferson County Defendants breached their duty to exercise reasonable care in the training and supervision of their subordinate employees and agents.

276.  Wellpath and Jefferson County Defendants, because they knew or should have known of the lack of supervision, experience, and training among their employees and agents, also had reason to know that their employees and agents were likely to harm JCDF detainees in need of medical care, including Ms. Angelo.

277.  In failing to exercise reasonable care in the training and supervision of their employees and agents relative to their providing reasonable medical care and treatment, Wellpath and Jefferson County Defendants were negligent.

278.  The negligence of Wellpath and Jefferson County Defendants proximately caused Ms. Angelo significant physical and mental pain and suffering and other damages.

279.  Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiffs.

280.  Wellpath and Jefferson County Defendants conduct has proximately caused Plaintiffs significant pain, suffering, grief, loss of comfort and society, and other damages arising from the suffering and ultimate death of Ms. Angelo.

**FIFTH CLAIM FOR RELIEF**
**Wrongful Death under C.R.S. § 13-21-202**
**(K.L. Against All Defendants)**

281.  Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

282.  Plaintiff K.L. is the heir of Abby Angelo.

283.  Plaintiff suffered and continue to suffer economic and non-economic damages due to Defendants' conduct toward Ms. Angelo, including but not limited to

economic damages for funeral expenses and financial losses due to the financial benefits he may have reasonably expected to receive from Ms. Angelo had she lived, and non-economic damages for grief, loss of Ms. Angelo's companionship, impairment in the quality of his life, inconvenience, pain and suffering, and extreme emotional stress.

284.  Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Ms. Angelo or her son.

285.  Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

(a)     All appropriate relief at law and equity;

(b)     Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims as allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)      Punitive damages on all claims allowed by law and in an amount to be

determined at trial;[3]

(f)      Attorneys' fees and the costs associated with this action, including expert

witness fees, on all claims allowed by law;

(g)      Pre- and post-judgment interest at the appropriate lawful rate; and

(h)      Any further relief that this court deems just and proper, and any other relief

as allowed by law.


**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


Respectfully submitted this 12th day of September 2023.

*s/ Virginia Hill Butler*
Virginia Hill Butler
Matthew Cron
Felipe Bohnet-Gomez
Siddhartha H. Rathod
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
vb@rmlawyers.com
mc@rmlawyers.com
fbg@rmlawyers.com
sr@rmlawyers.com

---

[3] Plaintiffs notify Defendants that, though a claim for exemplary damages on Plaintiffs'
state law claims cannot be included in the initial complaint, they intend to move to
amend the complaint to add exemplary damages.