IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-01607-CNS-STV

The ESTATE OF ABBY ANGELO;
KRISTIE ANGELO, as Personal Representative of the Estate of Abby Angelo; and
K.L., a minor, by and through his grandmother, Kristie Angelo,

      Plaintiffs,

v.

THE BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, a
governmental entity;
REGGIE MARINELLI, in her official capacity as Jefferson County Sheriff;
WELLPATH, LLC;
CARRIE EARLE, LPN, in her individual capacity;
REBECCA STRONG, LPN, in her individual capacity;
COURTNEY SLOWEY, LPN, in her individual capacity;
NICOLE WOLF, RN, in her individual capacity; and
ESMERALDA ZIEGELMANN, RN, in her individual capacity,

      Defendants.

---

## ORDER

---

      Before the Court are two motions to dismiss: (1) the Wellpath Defendants' Motion to Dismiss Plaintiff's First Amended Complaint filed by Wellpath LLC; Carrie Earle, LPN; Rebecca Strong, LPN; Courtney Slowey, LPN; Nicole Wolf, RN; and Esmeralda Ziegelmann, RN, all in their individual capacities; and (2) the Jefferson County Defendants' Motion to Dismiss filed by the Board of County Commissioners of Jefferson County and Reggie Marinelli, in her official capacity as Jefferson County Sheriff. ECF

Nos. 54, 62. For the following reasons, the Wellpath Defendants' motion to dismiss is DENIED, and the Jefferson County Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I.  BACKGROUND[1]

### A. Ms. Angelo's Death

Abby Angelo was found dead in her cell at the Jefferson County Detention Facility on June 28, 2021, at the age of 29, after exhibiting significant signs of illness and receiving minimal medical care.

A week earlier, on June 19, 2021, Ms. Angelo was arrested after Wheat Ridge police officers, responding to a report of a potential drug overdose in a King Soopers parking lot, spoke to Ms. Angelo and found three outstanding warrants for her for failure to appear. ECF No. 47, ¶¶ 35–38. The officers transported her to the Jefferson County Detention Facility (JCDF), which was and is operated by the Jefferson County Sheriff's Department. *Id.*, ¶¶ 38–39.

When she arrived at the JCDF, she was medically evaluated by EMT Deliah Gresko. *Id.*, ¶¶ 40–43. Ms. Angelo's blood pressure was 108/70, her pulse was 106, her oxygen saturation (SpO2) was 94, her temperature was 98.6, and she had 14 respirations per minute. *Id.*, ¶ 45. Ms. Angelo disclosed that she had had a fever in the past seven days of 102 degrees. *Id.*, ¶ 46. She also underwent an unclothed body search, during which track marks consistent with intravenous drug use were visible. *Id.*, ¶¶ 47–48.

---

[1] The background facts are taken from the well-pleaded allegations in the First Amended Complaint and Jury Demand, ECF No. 47. For purposes of this motion, the Court accepts as true, and views in the light most favorable to Plaintiffs, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

Ms. Angelo's SpO2 level of 94 was slightly below normal. *Id.* SpO2 levels of 95 to 100 are considered normal. *Id.* For oxygen saturation, 88 is a critical inflection point—it is recommended that people with a blood saturation level below 88 seek emergency medical care. *Id.*, ¶¶ 69–72. Each percentage point lower than 88 elevates the severity of the situation because oxygen saturation is measured on a logarithmic scale; that is, the decline represented by each percentage point drop becomes greater as the percentage gets lower. *Id.* Even if oxygen saturation later improves, having a recent low SpO2 still indicates a need for emergency care. *See id.*, ¶¶ 91, 117–18.

Ms. Angelo was housed in Module 6A from June 20 to June 26 under the supervision of Deputies Sadie Scott and Stephanie Whiting. *Id.*, ¶¶ 53–54. Deputies Scott and Whiting noticed Ms. Angelo's health declining over these six days. *Id.*, ¶ 61. Ms. Angelo spent most of her time in her cell; the two deputies did not see Ms. Angelo interact with any other inmates during this period, and neither deputy remembers her spending time in the common areas. *Id.*, ¶¶ 55–57. Ms. Angelo declined to leave her cell to shower, saying that her body hurt. *Id.*, ¶ 60. Multiple times, the deputies asked if she was okay, and Ms. Angelo responded by saying she was tired or not feeling well. *Id.*, ¶ 59. She declined breakfast three times. *Id.*, ¶ 62.

Ms. Angelo also displayed signs that she had used intravenous drugs. *See, e.g., id.*, ¶¶ 62–64. She had bruising on her legs that Deputy Scott described as "track marks," and on June 26, she told Deputy Scott that she was withdrawing from heroin. *Id.*

On June 25, Ms. Angelo was moved to a different cell for health reasons. *Id.*, ¶ 66. Soon after, just before 5:00 p.m., she had her first sick visit with medical staff; she met

with Defendant Carrie Earle, Licensed Practical Nurse (LPN). *Id.*, ¶¶ 65, 67. LPN Earle took Ms. Angelo's vital signs: her blood pressure was 126/76, her pulse was 133, her SpO2 was 85, her temperature was 99, and she had 16 respirations per minute. *Id.*, ¶¶ 67–68. As mentioned, an SpO2 of 85 is below the inflection point of 88 at which emergency care is recommended. *See id.*, ¶ 71. LPN Earle noted that Ms. Angelo was "lying on bed on stomach states she hasn't felt well in a few days. Her only complaint is SOB [shortness of breath]. Pt has been urinating on floor. She is able to walk to toilet and down the stairs without difficulty. Pt. waiting on covid results. No medical history noted per pt." *Id.*, ¶ 72. She also noted that Ms. Angelo's skin was "Moist/Clammy," and under "Routine Interventions," she recommended to "[m]onitor SP02and [sic] vital signs until stable" and "if condition does not improve notify HCP for direction otherwise." *Id.*, ¶¶ 72, 74. She wrote that no follow up was required. *Id.*, ¶ 75. LPN Earle then gave Ms. Angelo two 500 mg tabs of acetaminophen and an albuterol inhaler. *Id.*, ¶ 73. As an LPN, Defendant Earle was not authorized to diagnose Ms. Angelo, nor did she escalate Ms. Angelo's care to a more qualified medical professional. *See id.*, ¶ 76.

At 7:35 p.m. on June 25, Ms. Angelo was seen by Defendant Rebecca Strong, LPN, who had the same medical qualifications as LPN Earle and thus was also not qualified to diagnose Ms. Angelo. *Id.*, ¶ 85. When LPN Strong took her vitals, Ms. Angelo's blood pressure was 99/53, her pulse was 116, her SpO2 was 94, her temperature was 97.8, and she had 20 respirations per minute. *Id.*, ¶ 89. LPN Strong wrote that "Pt is very diaphoretic [sweating heavily], states SOB, body aches and cough. States there was a little blood in spitum [sic]." *Id.*, ¶ 89. LPN Strong had access to Ms. Angelo's medical

chart, which contained LPN Earle's notes and Ms. Angelo's vital sign measurements from earlier that day. *Id.*, ¶ 90. LPN Strong did not provide Ms. Angelo with medical care or escalate her care to a more qualified medical professional. *Id.*, ¶ 92.

On June 26, at 12:21 p.m., Ms. Angelo declined to move cells because she felt so sick. *Id.*, ¶ 94. LPN Strong took her vitals at 7:29 p.m. Her blood pressure was 106/84, her pulse was 80, her temperature was 97.5, her SpO2 was 85, and her respirations were 24 per minute. *Id.*, ¶ 95. LNP Strong noted: "Difficulty getting 02 sat, painful respirations. Crackles in lungs. Contacted charge for further eval." *Id.*, ¶ 96. Crackles indicate fluid or inflammation in the lungs. *Id.*, ¶ 100. Plaintiffs allege that the crackles, SpO2 of 85, and elevated heart rate required emergency care. *Id.*, ¶¶ 100–01. LPN Strong did not escalate Ms. Angelo's care to a more qualified medical professional, but merely to the charge nurse. The "charge" at the time was Defendant Courtney Slowey, LPN, who was the same medical level as LPN Strong, and not more qualified than LPN Strong. *Id.*, ¶¶ 104–06.

At some time on the evening of June 26 or the early morning of June 27, up to six hours after LPN Strong referred Ms. Angelo to LPN Slowey, LPN Slowey saw Ms. Angelo. *Id.*, ¶ 108. Ms. Angelo was brought by wheelchair because she was too weak to walk. *Id.*, ¶ 109. Her blood pressure was 112/80, her pulse was 110, her temperature was 97.0, her SpO2 was 95, and her respirations were 16 per minute. *Id.*, ¶ 110. She tested negative for COVID and influenza. LPN Slowey wrote that "USV floor nurse reports O2 reading low" and "Patient is brought to medical via wheelchair and states 'I don't feel good' she has c/o SOB, body aches, and cough (patient did not cough entire time in medical). Skin is warm and dry to touch, color appropriate to ethnicity. HRRR no murmurs, rubs, or

gallops noted. Dorsalis pedis and radial pulses 2+, equal bilaterally. Cap refill <2 seconds in all digits. LCTA, breathing is even and unlabored, oral mucosa and nail beds are free from cyanosis." *Id.*, ¶ 113. She noted that Ms. Angelo complained of shortness of breath, general malaise, and aches, and that there was some dried blood in her nose. *Id.*, ¶ 114. LPN Slowey marked "Nursing" under "Scheduled Follow-Up," although there is no record that any follow up care was provided. *Id.*, ¶¶ 116–17. Plaintiffs allege that LPN Slowey did not refer Ms. Angelo to a more qualified medical provider, attempt to determine the cause of her condition, provide a plan of care, or provide any medical treatment to Ms. Angelo whatsoever. *Id.*, ¶¶ 121–26.

Throughout the day of June 27, Deputies Scott and Whiting demonstrated concern about Ms. Angelo's declining health, including calling medical staff twice. *Id.*, ¶ 127. Ms. Angelo made suicidal statements to Deputy Scott, so they moved her to a special housing unit cell; while doing so, the two deputies conducted an unclothed body search of Ms. Angelo and noticed that her skin was cold to the touch. They also had to transport her in a wheelchair and assist her into her bunk because she was too weak. *Id.*, ¶¶ 128–30. Ms. Angelo told a friend and Deputy Petrakis that she was very confused, that she felt very sick, and that she was in a lot of pain. *Id.*, ¶¶ 132–33. Each time deputies observed Ms. Angelo in her cell, she was lying naked on the lower bunk. *Id.*, ¶ 134.

At 8:04 p.m. on June 27, Defendant Esmeralda Ziegelmann, Registered Nurse (RN), placed Ms. Angelo on an opiate withdrawal protocol. Plaintiffs allege that Ms. Angelo's symptoms, particularly her low SpO2, the crackles in her lungs, and shortness of breath (all of which were recorded in her file), were not consistent with opiate

withdrawal. *Id.*, ¶ 136. RN Ziegelmann took Ms. Angelo's vital signs: her blood pressure was 100/62, her pulse was 107, her temperature was 95.8, her SpO2 was 98, and her respirations were 16 per minute. *Id.*, ¶ 138. Plaintiffs allege that a temperature of 95.8 is unusually low, and often is a sign of sepsis. *Id.*, ¶ 139. Despite these vital signs, RN Ziegelmann did not escalate Ms. Angelo's care. RN Ziegelmann then filled out a variety of withdrawal assessment forms, including for opiates, that indicated either minimal or no withdrawal from alcohol or benzodiazepines, and mild withdrawal from opiates. *Id.*, ¶¶ 140–44. RN Ziegelmann checked "nursing" under the section for follow up. *Id.*, ¶ 143. She then prescribed a variety of medications for opioid withdrawal, which Ms. Angelo never took, and recommended follow-up withdrawal assessments, which would include taking Ms. Angelo's vital signs. *Id.*, ¶ 144.

At 11:21 p.m., RN Ziegelmann completed an additional opiate withdrawal assessment form for Ms. Angelo, indicating that her blood pressure was 100/72, her pulse was 88, her temperature was 97.5, her SpO2 was 97, and she had 14 respirations per minute. The assessment indicated mild withdrawal, which Plaintiffs allege is inconsistent with the severity of the symptoms Ms. Angelo was exhibiting. *Id.*, ¶¶ 145–48.

The next morning, on June 28, Ms. Angelo's health continued to deteriorate. She did not get up for breakfast, and she was consistently seen lying on the ground or her bunk naked and barely moving. *Id.*, ¶¶ 149–51. Deputy Petrakis did 15 walkthroughs of the special housing unit that morning, and each time saw Ms. Angelo naked and barely moving on her bunk. *Id.* At some point between 6:55 and 8:20 a.m., Defendant Nicole Wolf, RN, administered morning medications. *Id.*, ¶¶ 152–53. Accompanied by Deputy

Petrakis, RN Wolf saw Ms. Angelo. *Id.* At the time, Ms. Angelo was too weak to move and had been lying naked on her cell floor for hours. *Id.*, ¶¶ 153–55. Ms. Angelo declined her medications by "softly saying 'no.'" *Id.*, ¶¶ 154–55. RN Wolf described Ms. Angelo as "alert and oriented so she did not force the issue, they just moved on to the next inmate." *Id.*, ¶ 155. Plaintiffs characterize this description as "blatantly untrue." *Id.*, ¶ 156. RN Wolf had access to Ms. Angelo's medical chart and knew that Ms. Angelo had previous symptoms and concerning vital signs. *Id.*, ¶¶ 155–57. RN Wolf also would have seen Ms. Angelo's track marks from intravenous drug use since she was naked. *Id.*, ¶ 158. RN Wolf filled out a Refusal of Clinical Services Form and wrote, as a potential side effect of Ms. Angelo's refusal, "no therapeutic effect from medication; death." *Id.*, ¶ 161. RN Wolf filled out the opiate withdrawal evaluation form, but she did not take Ms. Angelo's vital signs. *Id.*, ¶ 164.

Deputies saw Ms. Angelo continue to exhibit signs of sickness: she refused meals, a visit with her attorney, and a shower, and she was continually seen lying down naked and barely moving. *Id.*, ¶¶ 165–70. At around 4:10 p.m., RN Wolf and a deputy returned to Ms. Angelo's cell for afternoon medication dispensation and found her unresponsive. *Id.*, ¶¶ 171–72. Ms. Angelo was pronounced dead at 4:41 p.m. Her time of death was estimated to be five to 10 minutes before RN Wolf found her.

Ms. Angelo died from tricuspid valve endocarditis (TVE), a heart infection often exhibited in intravenous drug users. *Id.*, ¶¶ 175–65. Untreated TVE is often fatal, but TVE can be treated with a four- to six-week course of antibiotics, or, in more advanced cases,

surgery. The prognosis is good for treated TVE, even in advanced stages. *Id.*, ¶¶ 179–80.

### B. Wellpath's History at the Jefferson County Facility

The Jefferson County Defendants contracted with Wellpath to provide medical care and medical personnel at the Jefferson County Detention Facility for at least the six years prior to this incident. *Id.*, ¶ 190.[2] Plaintiffs allege that this contract financially incentivizes Wellpath to not use necessary off-site medical services for inmates, because Wellpath is required to pay for a certain amount of those expenses. *Id.*, ¶¶ 193–94. Plaintiffs also allege that Wellpath staff are trained not to escalate patients to more qualified medical providers. *Id.*, ¶ 197.

Plaintiffs also point to Wellpath's history of failing to provide adequate medical care in detention facilities.[3] Plaintiffs point to five adverse medical outcomes at the JCDF allegedly caused by Wellpath's deliberately indifferent policies—notably the delay in, or denial of, adequate medical care. Paul Abeyta died of complications of opioid withdrawal on May 1, 2020, "after not receiving adequate medical care in response to his obvious withdrawal symptoms." *Id.*, ¶ 204. Ronald Rogacki suffered serious symptoms from an oral/sinus infection beginning in August 2019, including painful headaches, drainage, and hearing and vision loss. *Id.*, ¶ 205. John Kowalski died from complications of opiate withdrawal on March 28, 2019, after "JCDF and Wellpath staff did not provide adequate medical care nor life-preserving checkups on his condition." *Id.*, ¶ 206. Jennifer Lobato

---

[2] Wellpath has been renamed at least three times (previously known as CHC, CCS, or CHM). *Id.*, ¶ 191.
[3] Much of this information that Plaintiffs allege comes from lawsuits against Wellpath and its predecessors.

died from opiate withdrawal complications on March 2, 2015, after showing obvious withdrawal symptoms and receiving no medical care. *Id.*, ¶ 207. Kenneth McGill was denied medical treatment "while exhibiting obvious signs of a stroke" in September 2012. *Id.*, ¶ 208. Plaintiffs also point to 12 deaths and two serious adverse health outcomes from Wellpath facilities across the country because of delayed or inadequate medical care and refusal to transfer inmates to off-site medical facilities. *Id.*, ¶¶ 211–23.[4]

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g.*, *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins*

---

[4] Plaintiff also references news and governmental investigations into Wellpath. CNN wrote a report in 2019 that a Wellpath predecessor, CCS, had "provided substandard care that has led to deaths and other serious outcomes that could have been avoided" amid a focus on "cost containment" and corporate growth. *Id.*, ¶ 210. Such systemic failures included failing to diagnose and monitor life-threatening illnesses, denying emergency room transfers, failing to treat serious psychiatric disorders, and allowing common conditions to become fatal. *Id.* The National Commission on Correctional Health Care, in 2007, reported serious and systemic deficiencies in the care provided to prisoners by CHC-related companies in the Tulsa jail, and in a 2010 audit reported deficient care. *Id.*, ¶¶ 225, 228. In 2008, the U.S. Department of Justice found that the jail medical program administered by a CHC-related entity was constitutionally deficient. *Id.*, ¶ 226. In 2010, an Oklahoma Department of Health investigation indicated similar deficiencies. *Id.*, ¶ 227. The U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties conducted a review of CHC in 2011 and found a prevailing attitude of indifference among clinic staff. *Id.*, ¶ 230.

*v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

## III.  DISCUSSION

Having reviewed the First Amended Complaint, the motions to dismiss, the related briefing, and relevant legal authority, the Court denies the Wellpath Defendants' motion to dismiss and grants in part and denies in part the Jefferson County Defendants' motion to dismiss. The Court addresses the motions in turn.

### A.  The Wellpath Defendants' Motion to Dismiss

The Wellpath Defendants move to dismiss Plaintiffs' (1) deliberate indifference to serious medical needs claims against the individual Defendants, (2) *Monell* claim against Wellpath, LLC, and (3) negligent training and supervision claims against Wellpath, LLC. ECF No. 62. As discussed below, the Court finds that Plaintiffs pleaded sufficient facts to support their claims against the Wellpath Defendants.

#### 1.  *Applicable Constitutional Amendment*

The Court first addresses whether Ms. Angelo's deliberate indifference claim arises under the Eight Amendment or the Fourteenth Amendment. This determination depends on whether Ms. Angelo was a pretrial detainee, in which case the Fourteenth

11

Amendment applies, or if she was a post-conviction inmate, in which case the Eighth Amendment applies.[5] The Court determines that she was a pretrial detainee, and the Fourteenth Amendment governs Ms. Angelo's deliberate indifference claim.

Ms. Angelo pleaded guilty on March 4, 2019, and was sentenced to 18 months of probation. ECF No. 55 at 5–6; ECF No. 75 at 35. The state court issued a warrant for failure to appear on June 22, 2020, and Ms. Angelo was arrested on June 19, 2021. ECF No. 55 at 3–4. Ms. Angelo did not have a probation revocation hearing or advisement, nor did she admit to probation revocation. The Court agrees with Plaintiffs' assessment that Ms. Angelo had not been convicted of a probation violation and had not received a sentence of incarceration, so would not properly be considered "incarcerated." This issue was squarely addressed in *Montoya v. Newman*, 115 F. Supp. 3d 1263 (D. Colo. 2005). There, the plaintiff was incarcerated for, but not yet convicted of, a probation violation. *Id.* at 1289–90. He had not been sentenced to jail or prison on the underlying conviction, so the "sole reason for his incarceration in March 2011 was the alleged but unadjudicated probation violation." *Id.* The court determined that the plaintiff was a pretrial detainee. Similarly here, Ms. Angelo's underlying conviction did not include a jail or prison sentence; the only reason she was incarcerated was because of the alleged probation violation. Because that probation violation had not been adjudicated, she was a pretrial detainee.[6]

---

[5] Regardless of whether Ms. Angelo was a pretrial detainee or a post-conviction inmate, the analysis for deliberate indifference would be identical. *See Estate of Booker v. Gomez*, 745 F.3d 405, 430 n.30 (10th Cir. 2014) ("[A]lthough pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (internal citations and quotation marks omitted)).

[6] This analysis is also relevant to the Jefferson County Defendants' argument on the Colorado Governmental Immunity Act, which will be addressed more below.

2. *Plaintiffs' Fourteenth Amendment Deliberate Indifference Claim Against the Individual Defendants*

Under the Fourteenth Amendment, pretrial detainees have a constitutional right to adequate medical care. *See, e.g., Est. of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994). A claim for inadequate medical care under the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983, is analyzed under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303 (10th Cir. 1985). Under this test, the detainee must show that a medical professional acted with deliberate indifference to the detainee's serious medical needs. *Id.*; *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation omitted). The test for deliberate indifference involves both "an objective and subjective component." *Sealock*, 218 F.3d at 1209 (citation omitted).

To satisfy the objective component, a plaintiff must allege facts demonstrating that their medical need was "sufficiently serious." *See Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quotation omitted). A medical need is "sufficiently serious" if it has been diagnosed by a physician as mandating treatment or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. A delay in medical care satisfies the objective component if a plaintiff alleges facts showing the delay "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citation omitted). A substantial risk of harm is sufficiently serious if it is "sure or very likely to cause serious illness and needless suffering" or gives rise to "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993).

To satisfy the subjective component, a plaintiff must allege facts demonstrating the prison official's "culpable state of mind," meaning facts that the official (1) knows of and (2) disregards an excessive risk to inmate health or safety. *See id.*; *Sealock*, 218 F.3d at 1209.

To establish knowledge, a prison official both (1) must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) must have drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 387 (1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious." *Lucas v. Turn Key Health Clinics,* LLC, 58 F.4th 1127, 1137 (10th Cir. 2023) (citing *Farmer*, 511 U.S. at 842). A plaintiff may adequately allege that a medical official knew that a detainee faced a substantial risk of harm from the fact that the risk was obvious; if a risk is so obvious that a reasonable person would realize it, a court may infer that the defendant did, in fact, realize it. *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1263 (10th Cir. 2022) (quotation omitted).

"A medical condition is not required to be obvious to a layman to state a claim," although whether a condition would be obvious to a layman is a factor indicating obviousness. *Lucas*, 58 F.4th at 1139. In a missed diagnosis or delayed referral context, such circumstantial evidence of obviousness could include "(1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical

emergency." Additionally, a medical professional's "heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk," especially when the injuries are "impossible for a layman to surmise." *Id.*

A plaintiff need not show that the defendant was aware of the *particular* illness to constitute knowledge that a substantial risk of harm exists. Being aware of the symptoms is sufficient. *See, e.g., Lucas*, 58 F.4th at 1141 ("[T]he complaint need not show [the medical provider] was consciously aware [the inmate] had a specific ailment . . . but rather that he was aware she faced a substantial risk of harm to her health and safety.") Similarly, it is not necessary for the medical official to know that a symptom is a symptom of a particular disease. Awareness of the symptom, and its potential to indicate a serious illness, is enough. For instance, it is enough to recognize that a low body temperature is dangerous; it is not necessary to make the connection that a low body temperature could indicate sepsis.

An official disregards risk when they fail to take reasonable measures to abate the risk. *Id.* at 1137. Plaintiffs can sufficiently plead disregard of a risk in two ways: by failing to properly treat a serious medical condition (the failure to properly treat theory) or by preventing treatment or denying access to a medical professional capable of evaluating the need for treatment (the gatekeeper theory). *Id.* at 1138. Under the failure to properly treat theory, the Tenth Circuit looks to whether "there was a functional denial of care at the time the need for treatment obviously arose." *Id.* It is not necessary to prove that the inmate received no care; a provider can be held liable for "woefully inadequate" treatment, like prescribing over the counter medicines for serious symptoms indicating substantial

risk to health. *See id.; Oxendine v. Kaplan*, 241 F.3d 1272, 1279 (10th Cir. 2001) (finding liability where the medical provider only prescribed Tylenol for a gangrenous hand).

The gatekeeper theory applies when a medical professional knows that their role in a medical emergency is solely to refer the patient to a more qualified medical professional. *Id.* A prison medical professional who serves "as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751; *Est. of Jensen v. Clyde*, 989 F.3d 848, 860 (10th Cir. 2021). A gatekeeper fails in their duty if they "den[y] access to someone capable of evaluating the inmate's need for treatment." *Lucas*, 58 F.4th at 1137. "Even a brief delay in treatment can be unconstitutional." *Id.*

### a. Objective Component

The Wellpath Defendants do not dispute that the objective component is satisfied. ECF No. 62 at 18. Death is, "without a doubt, sufficiently serious to meet the objective component." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). The Court agrees.[7] Additionally, Ms. Angelo's symptoms were sufficiently serious: her low Sp02, low body temperature, weakness, pain, shortness of breath, crackles in her lungs, urinary incontinence, and inability to move are all sufficiently severe symptoms that require a doctor's attention, and these intermediate harms resulted in death. *See id.* Because the

---

[7] The objective component would also be satisfied if the symptoms that eventually led to death were severe enough to prompt a layperson to seek immediate medical attention. *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quotation omitted); *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022).

objective component is satisfied for all individual Defendants, the Court turns to the subjective component.

### b. Subjective Component

The Wellpath Defendants argue that, collectively, the individual Defendants did not meet the subjective component of the deliberate indifference standard, meaning they lacked a culpable state of mind. First, they claim that Plaintiffs did not allege that the individual Defendants knew that Ms. Angelo was experiencing TVE and consciously disregarded that fact. The Court disagrees. Awareness of the particular illness is not required; awareness of the symptoms can sufficiently lead to an inference of a substantial risk of harm. Ms. Angelo's symptoms were sufficiently severe to lead to this inference, even without knowing the TVE diagnosis. The Wellpath Defendants also argue that Plaintiffs did not allege that the individual Defendants knew that a low SpO2 was a symptom of TVE, and so the individual Defendants were not on notice that Ms. Angelo was experiencing a serious medical need. Because it is not necessary for individual defendants to be aware of a particular illness, it is also not necessary for them to know that a symptom is a symptom of a particular disease.

The Wellpath Defendants also argue that Plaintiffs fail to allege that the individual Defendants knew that intravenous drug use can cause TVE. Similarly, it is not relevant whether the individual Defendants knew that TVE can be caused by intravenous drug use; because the symptoms themselves are concerning, awareness of the particular disease is unnecessary. However, because a reasonable LPN would be aware that

serious illnesses can result from intravenous drug use, such as infections, that fact could heighten the obviousness of the need for emergency medical care.

The Wellpath Defendants also argue that Plaintiffs did not allege that the individual Defendants knew that a low SpO2 was a serious medical need. The Court disagrees. Plaintiffs adequately pleaded that a low SpO2 can be a sign of a serious medical need, so awareness of that low SpO2 could lead to the inference that a substantial risk of harm exists. Plaintiffs alleged in the complaint that "A patient with an SpO2 of 88 or below needs to be immediately taken to the Emergency Department" and that drops below 88 are "highly alarming." ECF No. 47, ¶¶ 68–71. Additionally, because of the medical training that LPNs and RNs have, a reasonable person with their training would know that an SpO2 below 88 was dangerous enough to warrant emergency care.[8] The Court is not convinced as to any of these arguments as to any individual Defendant.

### a.  Carrie Earle, LPN

Plaintiffs adequately pleaded that Defendant Carrie Earle, LPN, had knowledge of and disregarded a substantial risk of serious harm to Ms. Angelo. LPN Earle was aware of facts from which the inference could be drawn that Ms. Angelo faced a substantial risk of serious harm, and she drew that inference. First, LPN Earle knew that Ms. Angelo had a low SpO2. Plaintiffs adequately pleaded that LPN Earle knew that a low SpO2 was concerning, because she recommended to "[m]onitor SPO2 [] and vital signs until stable" and "if condition does not improve notify HCP for direction otherwise." Recommending

---

[8] The Tenth Circuit has applied a reasonable person standard to nurses who were not authorized to diagnose patients. See *Lucas*, 58 F.4th at 1139; *Quintana v. Santa Fe Cnty. Board of Comm'rs*, 973 F.3d 1022, 1041 n.3 (10th Cir. 2020) (concurring) ("[T]he proper subjective inquiry is whether . . . a substantial risk . . . would have been obvious to a reasonable person in the defendant's shoes.").

monitoring until her SpO2 stabilized indicates that LPN Earle knew that a low SpO2 is not a stable condition, and that she drew the inference between the low SpO2 and a substantial risk of harm. Additionally, LPN Earle knew that Ms. Angelo had an SpO2 below the 88% threshold, and a reasonable LPN would have recognized the obvious risk of harm that a low SpO2 poses. Although Plaintiffs did not state precisely that LPN Earle knew that a low SpO2 was dangerous, Plaintiffs pleaded enough facts to support the inference of knowledge, which is enough to satisfy the liberal pleading standard. ECF No. 94 at 6.

The Wellpath Defendants point to *Mata*, 427 F.3d at 745, to show that lack of knowledge is grounds for dismissal. However, *Mata* is distinguishable: in that case, "nothing in the record suggest[ed]" that the nurse believed that the patient was suffering from "severe chest pain"; the issue was that the nurse was not aware of the symptom. Here, in contrast, Plaintiffs pleaded that LPN Earle wrote down Ms. Angelo's low SpO2, thus showing her awareness of her symptoms. Rule 8 establishes a liberal pleading standard, and it is not necessary to use the magic words of a claim to plead it sufficiently. That the symptoms were "obviously alarming" is enough to support an inference of knowledge of the risk of harm, so pleading the obviousness of the symptoms is sufficient. *Lucas*, 58 F.4th at 1137. It is also not necessary, contrary to the Wellpath Defendants' arguments, to specifically plead that LPN Earle was trained that low SpO2 levels warranted emergency care. ECF No. 94 at 7. Rather, a reasonable LPN would know that a low SpO2 warrants emergency care.

Moreover, Ms. Angelo exhibited other symptoms, of which LPN Earle was aware, that were alarming enough that a reasonable person in the LPN's position would be aware of the substantial risk of harm that they presented. LPN Earle recorded Ms. Angelo's elevated temperature and heart rate. LNP Earle noted that Ms. Angelo was lying on her bed on her stomach, had not felt well in a few days, had shortness of breath, had urinary incontinence, and her skin was moist and clammy. These are all alleged facts from which an inference could be drawn that a substantial risk of harm exists; these are all serious symptoms in combination that indicate illness and the need for medical treatment. Two deputies, who were not medical professionals, repeatedly expressed concern about Ms. Angelo's deteriorating health, which indicates that these symptoms were obvious, and would be especially obvious to a nurse.

As alleged, LPN Earle disregarded the substantial risk of serious harm to Ms. Angelo, and so meets the subjective component of the deliberate indifference test, first because she failed to properly treat Ms. Angelo. She simply gave Ms. Angelo two 500 mg tablets of acetaminophen and an albuterol inhaler. As in *Lucas*, prescribing over-the-counter pain relief for serious symptoms may constitute woefully inadequate treatment. While the albuterol inhaler could alleviate Ms. Angelo's respiratory symptoms, LPN Earle was not qualified to diagnose Ms. Angelo and so could not determine whether she had a lung condition that warranted an albuterol inhaler. The remaining symptoms—urinary incontinence, general weakness, clammy skin, and concerning vital signs—were left untreated, and this amounted to a functional equivalent of a complete denial of care.

LPN Earle also demonstrated disregard because, based on the facts alleged, she failed in her role as a gatekeeper. LPNs are gatekeepers to prisoners accessing appropriate medical care, which the Wellpath Defendants concede. ECF No. 94 at 8 (Wellpath Defendants acknowledging that "LPN Earle understood her role as a gatekeeper."). LPNs do not have the authority to diagnose, so their role is to assess whether patients need care from a more qualified medical professional. LPNs can be liable for providing minimal treatment for serious symptoms without referring the inmate to a more qualified provider. *See, e.g., Est. of Jensen*, 989 F.3d at 854, 860 (finding deliberate indifference for "refusing to fulfill her duty as gatekeeper" when the inmate exhibited serious symptoms for four days—vomiting, diarrhea, and a sickly appearance— and the LPN only gave her Gatorade and did not escalate her treatment to a more qualified medical professional). Here, similarly, LPN Earle wrote that there was no need for follow up care because the issue was resolved, after only providing minimal treatment. This denial of follow-up care in the face of Ms. Angelo's obviously serious symptoms amounts to LPN Earle's refusal to fulfill her duty as gatekeeper. Plaintiffs pleaded sufficient facts to satisfy the subjective component and to support their claim of deliberate indifference against LPN Earle.

### b. Rebecca Strong, LPN

Plaintiffs allege sufficient facts that LPN Strong had knowledge of and disregarded an excessive risk to Ms. Angelo's health. First, LPN Strong was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she drew that inference. LNP Strong accessed and contributed to Ms. Angelo's medical chart,

which included Ms. Angelo's previous vital signs, notably her high temperature, elevated heart rate, and low SpO2. LPN Strong also wrote that Ms. Angelo was "very diaphoretic" and had shortness of breath, body aches, and a cough. ECF No. 47, ¶ 89. Later, LPN Strong took Ms. Angelo's vital signs and noted "difficulty getting O2 sat, painful respirations. Crackles in lungs. Contacted charge for further eval." *Id.* As described above, these physical symptoms and the vital signs are all obvious enough that a layperson would infer a risk of substantial harm to Ms. Angelo, so LPN Strong, as a medical professional, should have made that inference.

Since LPN Earle had seen her, Ms. Angelo had developed additional concerning symptoms: crackles in her lungs and painful respirations. As with LPN Earle, the fact that LPN Strong noted that the O2 saturation was an issue indicates that she had made the inference that a person with a low oxygen saturation faces a substantial risk of harm. As with LPN Earle, it is not necessary for Plaintiffs to plead that LPN Strong knew that heavy sweating, shortness of breath, body aches, cough, crackles in lungs, and painful respirations posed a substantial risk to Ms. Angelo; the risk of harm is obvious, which is enough. Similarly, the fact that the complaint lacked the specific allegation that LPN Strong was trained that crackles in lungs and painful respirations are emergency conditions does not make the complaint inadequate—a layperson would perceive these symptoms to be obviously harmful. A medical professional should as well.

As alleged, LPN Strong disregarded the excessive risk to Ms. Angelo's health, and so demonstrated subjective indifference, under both theories. Under the failure to provide medical care theory, LPN Strong disregarded the risk because she did not provide Ms.

Angelo with any medical care. Additionally, Plaintiffs have sufficiently pleaded that LPN Strong failed in her role as a gatekeeper. Even though LPN Strong referred Ms. Angelo to the charge nurse, the charge nurse at the time was LPN Slowey, who was not more qualified than LPN Strong. She also was not capable of diagnosing Ms. Angelo, so could not give her proper medical care. Because the gatekeeper theory applies when a gatekeeper denies access to *someone capable of evaluating the inmate's need for treatment*, a referral to someone without the ability to properly evaluate the inmate's need for treatment still constitutes a denial of access. *See Lucas*, 58 F.4th at 1138; *see also Crowson v. Wash. Cnty.*, 983 F.3d 1166, 1179 (10th Cir. 2020) (finding that the nurse knew that the detainee "had potentially alarming symptoms [seeming dazed and confused] and suspected there was a medical issue. That knowledge was sufficient to trigger [the nurse's] duty as a gatekeeper to provide [the detainee] access to medical personnel who could provide care"). LPN Slowey was not capable of evaluating Ms. Angelo's need for treatment because she, as an LPN, did not have the authority to diagnose.

An improper referral does not shield a defendant from liability. *Crowson*, 983 F.3d 1166, does not dictate a contrary result. In *Crowson*, the nurse referred the detainee to a physician assistant, who could provide a higher level of care. 983 F.3d at 1175. The nurse also believed that the detainee was displaying psychological symptoms, which would be adequately addressed by the PA because he handled all mental health care for the inmates. *Id.* Thus she did not fail in her gatekeeper role. Here, in contrast, LPN Strong was referring to a "charge nurse," who, by definition, could not provide emergency care.

Additionally, LPN Strong only referred Ms. Angelo to the charge nurse the day after her first visit. This delay on its own could be enough to demonstrate deliberate indifference. Plaintiffs have sufficiently alleged disregard under both the failure to provide medical care and the gatekeeper theories, and so have sufficiently pleaded the subjective component of a deliberate indifference claim against LPN Strong.

### c.  Courtney Slowey, LPN

Plaintiffs sufficiently alleged that LPN Slowey knew of and disregarded an excessive risk to Ms. Angelo's health. LPN Slowey was aware of facts from which the inference could be drawn that Ms. Angelo faced a substantial risk of serious harm. In addition to knowing all of Ms. Angelo's previous symptoms and vital signs from her medical chart, LPN Slowey was also aware of Ms. Angelo's deteriorating health. Ms. Angelo was too weak to walk to her sick visit and instead was wheeled in. LPN Slowey noted that Ms. Angelo had had a low SpO2, and that Ms. Angelo reported not feeling well, having a cough, having shortness of breath, and having body aches.

LPN Slowey disregarded the risk of harm under the failure to treat theory because she did not provide any medical care whatsoever.

LPN Slowey also disregarded the risk of harm under the gatekeeper theory because she did not refer Ms. Angelo to someone with the capability to diagnose Ms. Angelo. While she marked "nursing" as a scheduled follow-up on a form, a nurse was not qualified to properly treat Ms. Angelo at that point. As described above, a referral to someone not qualified to diagnose is denying access to someone capable of evaluating the inmate's need for treatment. Even if "nursing" refers to a higher-level nurse, Ms.

Angelo's symptoms arguably indicated a need for emergency care. Finally, even if a higher-level nurse was considered someone capable of evaluating Ms. Angelo's need for treatment, even a "brief delay" in making this referral could constitute deliberate indifference. Here, LPN Slowey made the referral by marking a check on a form. The inevitable delay built into this method of referral is significant: someone else would need to independently look at the form before seeing that a referral was made. For emergency care, such a delay is not reasonable. Plaintiffs pleaded sufficient facts to show disregard and to support a deliberate indifference claim against LPN Slowey based on both a failure to treat and a gatekeeper theory.

### d. Esmeralda Ziegelmann, RN

Plaintiffs also sufficiently pleaded that RN Ziegelmann knew of and disregarded an excessive risk of harm to Ms. Angelo's health. She had the requisite knowledge: RN Ziegelmann was aware of all of Ms. Angelo's symptoms that were recorded in her medical chart: low SpO2; shortness of breath; crackles in her lungs; being too weak to walk; and generally feeling sick and getting sicker. Additionally, RN Ziegelmann was aware of additional concerning symptoms: abdominal cramping and Ms. Angelo's low body temperature, which Plaintiffs allege is often a sign of sepsis. These symptoms would be obviously alarming to a reasonable layperson, let alone a reasonable RN, so RN Ziegelmann should have made the inference that these symptoms put Ms. Angelo at substantial risk of harm.

RN Ziegelmann did not appropriately treat Ms. Angelo, so she demonstrated disregard of the risk under a "failure to treat" theory. She placed Ms. Angelo on an opiate

withdrawal protocol, despite many of the symptoms not being consistent with opiate withdrawal and despite the incongruity between the severity of her symptoms and the withdrawal assessments' indications that she was suffering only "mild withdrawal."

The Wellpath Defendants' argue that RN Ziegelmann's decision to place Ms. Angelo on an opiate withdrawal protocol amounts merely to a difference of professional opinion, rather than a failure to adequately treat. The Court is not convinced. The point of *Sherman v. Klenke*, 653 F. App'x 580, 591 (10th Cir. 2016), was that a difference in professional opinion, *absent other facts*, is not enough to establish liability. *Id.* ("this discord—absent other facts—amounts to nothing more than a difference of professional opinion"). Here, there is no difference of professional opinion (no other professional had an opinion on her symptoms), and there are other facts, so *Sherman* is entirely irrelevant. The Wellpath Defendants also state that "it is unclear why Plaintiffs take issue with" the course of treatment. The issue is clear: the treatment was woefully inadequate, and Ms. Angelo died. The decision to place Ms. Angelo on an opiate withdrawal protocol was not merely a difference of professional opinion; it was a woefully inadequate course of treatment. These circumstances are more like prescribing Tylenol for a gangrenous hand, *Oxendine*, 241 F.3d at 1277, than to denying a surgery that another doctor recommended to remove a painful, non-life-threatening hernia, *Sherman*, 653 F. App'x at 591. Ms. Angelo was exhibiting symptoms so obviously alarming, and not related to opiate withdrawal, that a reasonable person would recognize the need for emergency care. Plaintiffs sufficiently pleaded RN Ziegelmann's disregard by failing to properly treat Ms. Angelo's symptoms.

Plaintiffs also properly pleaded disregard under the gatekeeper theory: RN Ziegelmann did not escalate Ms. Angelo's care to a more qualified medical professional who was capable of evaluating Ms. Angelo's need for emergency treatment. A reasonable person in her position would have recognized Ms. Angelo's need for emergency care based on the obviousness of her symptoms. Like LPN Slowey, RN Ziegelmann marked "nursing" under the follow-up section on the form; however, nurses would similarly not be able to evaluate her need for emergency treatment. Failing to refer Ms. Angelo to emergency care and prescribing only opiate withdrawal medications amounts to a functional equivalent to a complete denial of care. Plaintiffs have pleaded sufficient facts to indicate RN Ziegelmann's disregard of a substantial risk of serious harm, and so her subjective deliberate indifference, under both theories.

### e. Nicole Wolf, RN

Plaintiffs also sufficiently allege that RN Wolf knew of and disregarded an excessive risk to Ms. Angelo's health. First, she satisfied the knowledge component. RN Wolf, as the last provider to see Ms. Angelo before she died, was aware of everything in her medical chart: she had an SpO2 of 85 for two days; she had complained of shortness of breath, feeling sick, body aches, a cough, painful respirations, and a prior fever; there were crackles in her lungs; she was too weak to walk; she had experienced urinary incontinence and heavy sweating; and her vital signs had previously indicated low body temperature and high pulse. Additionally, RN Wolf saw Ms. Angelo when she had deteriorated further: she was too weak to move and had been lying naked in her cell for hours. Plaintiffs allege that RN Wolf was aware of these symptoms because she had

access to her medical records, from which the inference should have been drawn that Ms. Angelo faced a substantial risk of serious harm, because of their obvious severity. In fact, RN Wolf explicitly indicated that she knew that the risk of serious harm was likely when she wrote "death" as a possible risk of Ms. Angelo not receiving medication.

RN Wolf also demonstrated the "disregard" component under both theories. RN Wolf did not provide Ms. Angelo with any medical care, which constitutes a failure to properly treat her. She also did not refer her to a medical professional who could evaluate her need for emergency care, which constitutes disregard under the gatekeeper theory.

Overall, Plaintiffs pleaded sufficient facts to support deliberate indifference claims against each of the individual Defendants. For that reason, the Court denies the motion to dismiss related to these Defendants.

### 3. Plaintiffs' Fourteenth Amendment Monell Claim Against Wellpath

To establish a private entity's liability, the plaintiff must first plausibly allege that its employee or employees violated a plaintiff's constitutional rights. *See Est. of Beauford*, 35 F.4th at 1275. The plaintiff must then show that the entity is liable for the employee's violation of a plaintiff's constitutional rights by showing (1) the existence of a policy or custom; (2) a "direct causal link between the policy or custom and the injury alleged," meaning that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional rights; and (3) that the private entity enacted or maintained the policy with "deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *Hinton v. City*

*of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997).

A plaintiff satisfies the "official policy or custom" element by plausibly alleging the existence of:

> (1) A formal regulation or policy statement;
> (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
> (3) the decisions of employees with final policymaking authority;
> (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or
> (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and formatting omitted). The "official policy or custom" requirement is intended to distinguish "acts of the municipality from acts of employees of the municipality," making clear that municipal liability is limited to actions "for which the municipality is actually responsible." *Cacioppo v. Town of Vail, Colo*., 528 F. App'x 929, 932 (10th Cir. 2013).

The "deliberate indifference" element may be satisfied where the entity has actual or constructive knowledge that its acts or failure to act is "substantially certain to result in a constitutional violation," and the entity "consciously or deliberately" chooses to disregard the risk of harm. *Schneider*, 717 F.3d at 771 (quotation omitted). Notice can be established either by a "pattern of tortious conduct" or if a violation of rights is a "highly

predictable" or "plainly obvious" consequence of the entity's action or inaction. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Plaintiffs bring a Fourteenth Amendment claim against Wellpath based on its allegedly unconstitutional policies and practices.[9] The Wellpath Defendants allege that Plaintiffs cannot establish any theory of municipal liability under *Monell* because they only allege hybrid theories, mixing elements of the different theories of liability. Plaintiffs, however, plausibly allege three theories of municipal liability under *Monell*: (1) maintaining an informal custom amounting to a widespread practice, (2) failure to train, and (3) combined acts amounting to a violation.

As established above, Plaintiffs have adequately pleaded the first element of *Monell* liability: that the entity's employees, the individual Defendants, violated Ms. Angelo's constitutional rights.[10] The remaining three elements will be analyzed below, based on the three sources of entity liability that Plaintiffs allege.

### a. Informal Custom Amounting to Widespread Practice

Plaintiffs first allege *Monell* liability based on Wellpath's informal customs, amounting to widespread practices, of incentivizing reductions in off-site care through financial provisions in the Wellpath contract with Jefferson County, using a "wait and see" approach to care, failing to escalate care, and encouraging nurses to practice beyond their abilities and qualifications.

---

[9] The Tenth Circuit has extended *Monell* liability to private entities. *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1275 (10th Cir. 2022).

[10] The Court notes that individual liability is not necessary to state a *Monell* claim, as discussed below.

Plaintiffs allege that Wellpath is "contractually obligated to pay up to a certain amount of expenses for off-site medical care for each inmate," which then incentivizes reductions in the use of off-site medical care for detainees, which in turn incentivizes staff to disregard risks to detainees' health. ECF No. 47, ¶¶ 192–95. The Wellpath Defendants claim that this alleged policy is insufficient because Plaintiffs fail to set out the text of the policy, and the excerpt from the contract is insufficient. The Court does not agree, because Plaintiffs are not alleging that the contract itself is a formal policy; instead, they pleaded that these contractual provisions reflect an informal policy of incentivizing reductions in off-site medical services. This Court has previously held that an informal custom amounting to a widespread practice of incentivizing reductions in the use of necessary off-site medical services is a sufficiently articulated policy. *Rogacki*, 2022 WL 16551336 at *8. Similarly here, Plaintiffs have sufficiently alleged the existence of a policy of incentivizing reductions in off-site medical services.

Additionally, Plaintiffs allege the existence of an informal custom amounting to a widespread practice that nurses followed a "wait and see" approach, failed to escalate care, and practiced beyond their abilities. Plaintiffs point to the individual Defendants' actions regarding Ms. Angelo, to five similar constitutional violations at the JCDF and 17 at other Wellpath facilities, and governmental audits and press attention on Wellpath's deficiencies. ECF No. 47, ¶¶ 203–34. To establish the existence of a policy, plaintiffs need only plead "a pattern of multiple similar instances of misconduct," with no set number required to "render the alleged policy plausible." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). Here, while it is true that many of these alleged

instances have settled or not been litigated, the "outcome of any of the lawsuits is not relevant" to establish a policy, because the pleading standard requires courts to accept well-pleaded factual allegations as true. *Est. of Valverde v. Dodge*, No. 16-cv-1703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017).[11] Plaintiffs have sufficiently alleged the existence of two informal policies: financial disincentives to providing off-site care, and nurses practicing beyond their abilities, failing to escalate care, and using a "wait and see" approach. *See Rogacki v. Jefferson Cnty.*, No. 21-cv-02281-CNS-KLM, 2022 WL 16551336, at *8 (D. Colo. Oct. 31, 2022) (finding that allegations that Wellpath had a policy of "incentivizing reductions" in the use of "necessary off-site medical services" were sufficient to satisfy the informal policy element).

The Wellpath Defendants next dispute the causation element, alleging that the policy of disincentivizing referrals was not the moving force behind Ms. Angelo's death. The Court finds, however, that Plaintiffs sufficiently demonstrated the causal link between Wellpath's policy and Ms. Angelo's injuries. For instance, Plaintiffs allege that the challenged policy caused delay in the treatment of Ms. Angelo's TVE, including by not transferring her to a hospital or referring her to a physician, which resulted in her symptoms worsening and, ultimately, her death. *See* ECF No. 47, ¶¶ 71–203. Ms. Angelo displayed serious symptoms for at least three days while only being seen by nurses. *Id.* The nurses' treatment of Ms. Angelo was "consistent with the chronic deficiencies" in medical care that amounted to a widespread policy. *Burke*, 935 F.3d at 999. The

---

[11] As discussed below, the outcome of the lawsuits *is* relevant in determining whether the county had proper notice of the alleged constitutional violation.

"execution" of the policy—waiting to refer Ms. Angelo to a physician or outside medical care, implementing an opioid withdrawal protocol instead of appropriate care, and failing to address her serious symptoms—"inflicted" her injury by causing her condition to worsen. *See Hollingsworth*, 110 F.3d at 744. Plaintiffs sufficiently pleaded causation because a reasonable jury could find that the systemic deficiencies resulted in Ms. Angelo's death.

Plaintiffs also adequately pleaded the deliberate indifference element. Plaintiffs allege that Wellpath was on notice that its policies of incentivizing reductions in off-site care and encouraging nurses to practice beyond their abilities would result in Ms. Angelo's injury. *See, e.g.,* ECF No. 47, ¶ 233. Plaintiffs established that Wellpath was on notice by stating that the implementation of the policies carried an obvious risk of harm to detainees' health and that the policies resulted in a pattern of Wellpath employees failing to meet detainees' medical needs, including the individual Defendants' violations of Ms. Angelo's constitutional rights. *Rogacki* at *8; ECF No. 47, ¶¶ 79, 187, 198, 202, 253. Plaintiffs cited prior incidents at Wellpath institutions and the governmental investigations finding systemic deficiencies to establish an alleged "pattern of tortious conduct" sufficient to put Wellpath on notice. *Id.*, ¶¶ 31–33, 203–08. 34–39, 211–24, 33–34, 39–41, 210; *see Cacioppo*, 528 F. App'x at 932. Additionally, policies that offer economic incentives to deny medical care satisfy the deliberate indifference standard. *Rogacki* at *8. Continuing to adhere to those policies amounts to consciously disregarding that risk of harm. *Id.*, ¶¶ 231–33. Plaintiffs sufficiently pleaded all three elements of the unconstitutional informal policy theory of *Monell* liability.

### b. Failure to Train

As with municipal liability premised on a policy, to establish municipal liability based on inadequate training, plaintiffs must allege that the defendant "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. Under a failure to train theory, liability attaches when the "need for more or different training was so obvious, and the inadequacy so likely to result in [the constitutional violation] that the policymakers of [the county] can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Liability under a failure to train theory turns on whether the defendants had "[n]otice of particular deficiencies in a training program." *Est. of Lobato v. Correct Care Sols., LLC*, No. 15-CV-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017); *Zartner v. City and Cnty. of Denver*, 242 F. Supp. 3d 1168, 1173 (D. Colo. Mar. 13, 2017) (finding that plaintiffs had failed to state a claim against the defendant municipality for failure to train because the complaint made "no reference to . . . training protocols, inadequate or otherwise"). The causation inquiry "focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Est. of Lobato,* 2017 WL 1197295, at *7. Entity liability is at its "most tenuous" when premised on a failure-to-train theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Here, while it is true that Plaintiffs do not point to a previous incident of a death caused by TVE or Ms. Angelo's particular symptoms, Plaintiffs allege that the failure to

train is broader than failing to recognize TVE. Rather, Plaintiffs allege that LPNs are "supposed to work under the supervision of a more qualified medical provider," that "Wellpath failed to adequately train and supervise the medical staff," and that staff "are deliberately trained not to escalate care to more qualified medical providers." ECF No. 87 at 196–197. Training not to escalate care is a specific deficiency. Plaintiffs also established causation: if the nurses had been trained to escalate care, Ms. Angelo's death could have been avoided if she had been seen by emergency care providers.

As to the deliberate indifference element, Plaintiffs alleged that the policies, including the policy of inadequate training, "were so far outside the standard of care for medical professionals as to be obviously reckless." ECF No. 47, ¶ 202. Training nurses not to escalate care is an obvious deficiency in the training protocol, which is enough to put Wellpath on notice. Additionally, the 17 cited incidents of deaths and other serious adverse health outcomes were allegedly caused by Wellpath health care providers failing to refer detainees to off-site medical providers. While only one cited lawsuit (*McGill*) resulted in a verdict for Plaintiffs, the underlying instances are enough to put Wellpath on notice that its training is inadequate and likely to result in serious risk of harm such that the Wellpath policymakers can reasonably be said to be deliberately indifferent to the need for additional training.[12] Wellpath's continued adherence to its staffing, supervision,

---

[12] The court in *Lobato* held that *McGill* was not sufficient to establish notice that the training was deficient. *Est. of Lobato*, 2017 WL 1197295, at *8. However, the alleged training at issue in *Lobato* was that the nurses were not following the official opioid protocol, and the holding was that *McGill* did not establish notice that the nurses were likely to fail to respond adequately to opiate withdrawal by not following the official protocol. Here, in contrast, there is no official protocol that the nurses were inadequately following; instead, the allegation is that they were deliberately trained not to escalate care. Additionally, *Lobato* was ruling on a motion for summary judgment. The standard is different for motions to dismiss. The liberal pleading

and training policies in the face of these deaths and other serious outcomes plausibly demonstrates deliberate indifference to the need for additional training. Plaintiffs state a plausible claim under a failure to train theory.

### c.  Combined Acts Amounting to a Violation

Plaintiffs also allege that, even if the individual Defendants are not liable for constitutional violations, Wellpath can still be liable based on the combined acts of its employees which, collectively, amount to a violation. The Court recognizes that there is a possibility for *Monell* liability even where its employees are not individually liable. *See, e.g., Quintana*, 973 F.3d at 1033. However, there is no need to analyze this theory because the Court finds that here, Plaintiffs have sufficiently pled that the individual Defendants were each liable.

### 3.  Plaintiffs' State Law Claim for Negligent Training and Supervision Against the Wellpath Defendants

The Wellpath Defendants only move to dismiss one of Plaintiffs' tort claims: negligent training and supervision. The Court finds that the individual Defendants' propensity to provide inadequate medical care is a particular trait that risks harm to detainees, sufficient to impose a duty to supervise on Wellpath.

To establish a claim of negligent supervision and training, a plaintiff must allege "the usual elements of negligence—duty, breach of duty, injury, causation—and the establishment of an agency relationship between the employer and the alleged employee." *Nielsen v. Archdiocese of Denver*, 413 F. Supp. 2d 1181, 1184 (D. Colo.

---

standard dictates that all well-pleaded facts be taken as true, which includes the facts underlying the lawsuits cited in the complaint.

2006). The duty to supervise arises when the employer has "reason to know that [employees] were likely to harm others because of personal qualities," meaning knowledge of "the employee's attributes or conduct which would create an undue risk of harm," based on the "work or instrumentalities entrusted to them." *Gravina*, 516 P.3d at 48 (emphasis removed); *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005). "To succeed on a negligent training or supervision claim under Colorado law, a plaintiff must show tortious action by an employee and that the employer knew of the employee's attributes or conduct which would create an undue risk of harm to those in contact with the employee." *De Gomez v. Adams Cnty.*, 2021 WL 1581241, No. 20-cv-01824-CMA-NYW, at *12 (D. Colo. Feb, 23, 2021). The "duty imposed on the defendant was to take reasonable steps to prevent the foreseeable harm of a known risk—the person harmed was one who would likely be harmed by the known risk posed by the employee." *Keller*, 111 P.3d at 449. The "known risk" can be "the employer's knowledge of the employee's propensity to act in a particular manner," with the duty being "to take reasonable steps to prevent the employee from acting in such a manner." *Id.*

The Wellpath Defendants allege that Plaintiffs' negligent training and supervision claim fails because Plaintiffs fail to allege that Wellpath knew that any of its employees were incompetent, vicious, or careless.[13] However, the qualifying traits are not limited just

---

[13] The Court also notes that the Wellpath Defendants continue to perpetuate a well-known typo in the *Settle* case: "There is no liability for breach of the duty to supervise unless the principal or employer both knows the agent or employee is *not* 'incompetent, vicious, or careless,' and does not take 'the care which a prudent [person] would take in selecting the person for the business in hand." ECF No. 62 at 19 (citing *Settle v. Basinger*, 411 P.3d 717, 723 (Colo. App. 2013) (emphasis added)). The Colorado Court of Appeals in *Gravina* later clarified that the "not" that appears in *Settle* is, in fact, a mistake; it did not appear in the original case it cited, *Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988). *Gravina Siding & Windows Co. v. Gravina*, 516 P.3d 37, 48 n.10 (Colo. App. 2022).

to these three traits—there are other traits an employee can have that would risk harm, including a propensity to act in a certain manner. Here, Plaintiffs have adequately alleged that the individual Defendants had a propensity to provide inadequate medical care and to not refer inmates to off-site medical care. Plaintiffs pleaded this propensity by citing two lawsuits that other plaintiffs had previously filed against the same individual Defendants, LPN Slowey and RN Ziegelmann, and by alleging previous incidents (the same 17 incidents previously discussed, which come from allegations in prior lawsuits) involving "lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at JCDF." ECF No. 47, ¶¶ 203–22. Plaintiffs also alleged that Wellpath "knew or should have known that their failure to train and supervise their employees would cause such employees to fail to provide necessary medical assessment and care," and that Wellpath, "because they knew or should have known of the lack of supervision, experience, and training among their employees and agents, also had reason to know that their employees and agents were likely to harm JCDF detainees in need of medical care." ECF No. 47, ¶¶ 256, 276.

Based on these prior lawsuits against LPN Slowey and RN Ziegelmann, the other alleged incidents, and the allegation that Wellpath deliberately trained its employees not to escalate care, Plaintiffs have sufficiently pleaded that Wellpath should have known that its employees posed a risk of harm to inmates because of their propensity to provide inadequate medical care, and as a result, Wellpath had a duty to take reasonable steps to prevent the foreseeable harm from this risk. In other words, Wellpath had a duty to properly supervise and train these nurses to ensure that they provided adequate medical

care and appropriately referred inmates to off-site care. Plaintiffs adequately pleaded this by alleging that "Wellpath . . . neglected to adequately train and supervise their employees with respect to the proper procedures for the evaluation and treatment of JCDF detainees' and inmates' serious medical needs." ECF No. 47, ¶ 192. Therefore the claims of negligent training and supervision are not dismissed.

### B.  Jefferson County Defendants' Motion to Dismiss

The Jefferson County Defendants move to dismiss (1) all claims against the Board as a party, (2) the municipal liability claims based on *Monell* and the non-delegable duty doctrine against Sheriff Marinelli, and (3) the state law tort claims against Sheriff Marinelli. ECF No. 54. The Court grants in part and denies in part this motion.

#### 1.  The Board of County Commissioners of Jefferson County

The Jefferson County Defendants first move to dismiss all claims against the Board of County Commissioners because it is not the proper entity. The Court agrees and grants the motion to dismiss all claims against the Board.

The difference between the sheriff and the board is typically theoretical at this stage, because the true party at issue is Jefferson County and the question is which entity is appropriately sued as a representative of the County. *See Chavez v. Bd. of Cnty. Comm'rs of Lake Cnty., Colorado*, 426 F. Supp. 3d 802, 813 (D. Colo. 2019). However, here, whether the Board is a proper party affects whether the state law tort claims are barred by the statute of limitations, as discussed further below, so it is appropriate for the Court to resolve the split and determine whether the Sheriff or the Board is the proper party, or both.

The proper party depends on whether the Board or the Sheriff was involved in setting the policies at issue. The Board and the Sheriff are separately suable. "Under Colorado law, a board of county commissioners and a sheriff in the same county are distinct public entities . . . a board of county commissioners has no control over the sheriff's employees and is not liable for negligent acts of the sheriff's employees." *Est. of Blodgett v. Correct Care Solutions, LLC*, No. 17-cv-2690-WJM-NRN, 2018 WL 6528109, at *8 (D. Colo. Dec. 12, 2018); *see also Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005). Plaintiffs argue that the Board is a proper party because there may be factual disputes about the Board's involvement at the JCDF, so dismissal of the Board at this stage is not warranted. ECF No. 75 at 26. Defendants argue that the Board is not a proper party because it has no involvement with JCDF policy. ECF No. 54 at 4–5.

The claims arise from Ms. Angelo's death, occurring while she was in the jail's custody. The Sheriff, not the Board, is the custodian of the county jail and is responsible for the individuals incarcerated in the jail. Colo. Rev. Stat. § 30-10-511. The contract for Wellpath to provide medical services at the JCDF is between Wellpath and the Sheriff, not the Board. ECF No. 75 at 26–27. The Jefferson County Defendants argue that a sheriff may be sued independently from the county, pointing to Colorado statutes establishing how to serve a sheriff and when sheriffs are liable. ECF No. 54 at 4. The Court agrees. While courts in this district have been split on whether sheriffs can be separately sued,[14] the Court finds that, consistent with its construction of Colorado's

---

[14] *See Rogacki,* 2022 WL 16551336, at *11 n.10 ("Courts in this District are split on the question of whether a sheriff's office is suable separate from a county's board of commissioners. *See Watkins v. Douglas Cnty.*, No. 20-CV-01172-RM-MEH, 2020 WL 8408482, at *14-15 (D. Colo. Sept. 15, 2020), report and

statute and constitution, the sheriff is separately suable from the board. Here, Sheriff Reggie Marinelli is a proper party.

This Court has previously declined to dismiss the board at this stage,[15] as long as the plaintiffs alleged that the board was involved in setting the policy at issue.[16] A board may also be a proper party when a plaintiff alleges that it "was itself involved in setting or implementing a detention facility's allegedly unconstitutional policies." *Rogacki v. Bd. of Cnty. Comm'rs of Jefferson County, Colorado*, No. 1:21-cv-02281-CNS-KLM, 2023 WL 34755 (D. Colo. Jan. 4, 2023); *Est. of Lillis v. Correct Care Sols., LLC*, No. 16-cv-03038-KLM, 2018 WL 10954152, at *5 (D. Colo. Oct. 22, 2018) (recognizing that the board of county commissioners, not the sheriff, was the responsible party for the wrongs alleged and so naming the board as a party to the suit was "not futile.").

Here, however, Plaintiffs did not allege that the Board was involved in the operation of the jail or involved in establishing the jail's policies on providing medical care. ECF No. 47; *see Blodgett*, 2018 WL 6528109, at *8 (granting the motion to dismiss where the plaintiff did not allege "any policy of the board" that would support a claim against it). They simply allege that "Defendant Board of County Commissioners of Jefferson County is the

---

recommendation adopted, No. 20-CV-01172-RM-MEH, 2021 WL 100117 (D. Colo. Jan. 12, 2021) (collecting cases and explaining split in authority)").

[15] *Id.* ("it is appropriate for Mr. Rogacki to name both the Board of County Commissioners and relevant sheriff in this action. If discovery later reveals that only the sheriff was involved in the polices related to Wellpath's medical care at the Jail, the Court shall revisit the question of which Defendants should be properly named or dismissed").

[16] *Chavez v. Bd. of Cnty. Comm'rs of Lake Cnty., Colorado*, 426 F. Supp. 3d 802, 814 (D. Colo. 2019) ("[B]y the time of summary judgment and/or trial, [p]laintiffs will need to explain clearly the policy at issue and the policymaker(s) to whom the policy is attributable.").

public entity responsible for Jefferson County and the JCDF," which is not sufficient. ECF No. 47, ¶ 14.

The Court finds that Sheriff Marinelli is the proper party to this lawsuit and that Plaintiffs did not allege in the First Amended Complaint that the Board was involved in setting the policies at issue, so the Court dismisses all claims against the Board without prejudice.

### 2. Sheriff Reggie Marinelli

#### i. Direct Monell Liability

The Court analyzes Sherriff Marinelli's municipal liability under the same *Monell* standard discussed above. A plaintiff may establish "direct" *Monell* liability where a municipal employee committed a constitutional violation, and a municipal policy or custom is the "moving force" behind the plaintiff's constitutional injury and was maintained with "deliberate indifference" to the plaintiff's constitutional injury. *See Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931 (10th Cir. 2013) (quoting *Schneider*, 717 F.3d at 769). A plaintiff must show that the *municipality*'s practice or custom caused the alleged constitutional injury. *See, e.g., Cacioppo*, 528 F. App'x at 931.

Here, Plaintiffs alleged that Jefferson County had two informal customs amounting to widespread policies that violated Ms. Angelo's rights: including incentives to delay necessary outside medical care in the Wellpath contract, and the decision to contract with Wellpath, despite knowing Wellpath's practice of constitutional violations. ECF No. 75 at 30. The first element, an underlying constitutional violation committed by the entity's employees, has been established above.

Plaintiffs have not pleaded enough to establish a deliberate indifference claim based on the financial incentives in the contract. The contract itself does not constitute a Jefferson County policy. *See Rogacki,* 2022 WL 16551336, at *11. As in *McGill*, the contract "incentivizes (but does not in and of itself establish) a policy or practice favoring delay in the provision of emergency medical care to inmates." *McGill v. Corr. Healthcare Cos.*, No. 13-cv-1080-RBJ-BNB, 2014 WL 5423271, at *2 (D. Colo. Oct. 24, 2014). The contract simply establishes a payment structure for medical bills. *Id.* Plaintiffs also did not allege that the individual Defendants were aware of the contract and its payment scheme, or that there was any indication that the cost provisions impacted the decisions that the individual Defendants made; the complaint simply alleges that the contract "financially incentivizes reductions in the use of necessary off-site medical services for inmates, and as such, represents an unconstitutional policy" because it "invites reckless risk-taking to save money." ECF No. 47, 193–94. These allegations do not sufficiently establish a causal link between the financial incentives and the nurses' behavior: there is no allegation of how the policy influenced the actual provision of care. Because Plaintiffs did not adequately plead the causation element, they did not adequately plead direct liability based on the contract or its financial provisions.

Plaintiffs also alleged that Jefferson County's decision to contract with Wellpath amounted to an unconstitutional policy. The Court disagrees. The Court agrees that Plaintiffs have sufficiently pleaded that the decision to contract with Wellpath is a policy and that it caused Ms. Angelo's injury, because but for the contract Wellpath would not have been in a position to harm her. However, Plaintiffs have not sufficiently established

the deliberate indifference element, meaning they have not adequately pleaded that Jefferson County knew enough about Wellpath's unconstitutional practices to constitute deliberate indifference in its continued adherence to the contract with Wellpath.

Contrary to Plaintiffs' allegation, the disposition of the lawsuits is important in establishing whether Jefferson County was on notice that its adherence to the Wellpath contract was substantially certain to result in a constitutional violation. Only one lawsuit Plaintiffs cited involved a verdict in favor of the plaintiffs. *McGill*, 2014 WL 5423271. One lawsuit does not sufficiently place Jefferson County on notice that its policy of adhering to its contract with Wellpath would result in constitutional violations. *See Rogacki*, 2022 WL 16551336, at *11. The other cited lawsuits have either settled, or the disposition is not included in the complaint. Consistent with this Court's analysis in *Rogacki,* 2022 WL 16551336, at *11, allegations of lawsuits, absent an allegation of whether the municipality was found to have violated any rights, does not indicate that constitutional violations are a plainly obvious result of the decision to contract with Wellpath sufficient to establish notice.[17] *See Est. of Lobato*, 2017 WL 1197295, at *8 ("[u]nsubstantiated allegations from complaints filed against the CCS defendants, without more, do not put the CCS defendants on notice that the training of their nursing staff is deficient regarding opiate withdrawal."). Plaintiffs have not plausibly stated a claim for direct *Monell* liability against the Jefferson County Defendants.

---

[17] However, over time, substantiation of similar allegations across multiple lawsuits may eventually serve as sufficient notice to Jefferson County.

*ii.   Nondelegable Duty Doctrine and Indirect Municipal Liability*

Plaintiffs alleged that the Sheriff "intentionally delegated final policymaking authority" to Wellpath and is therefore "liable under the nondelegable duty doctrine for the deliberate indifference" of Wellpath and its employees. ECF No. 47, ¶ 232. The Jefferson County Defendants argued that Plaintiffs did not properly plead that the Sheriff delegated its policymaking authority to Wellpath. ECF No. 54 at 13. The Court disagrees.

Under the non-delegable duty doctrine, a public entity may be indirectly liable under § 1983 for a third party's policies when it contracts out its final policymaking authority to a third party. *See, e.g.*, *Jarvis v. McLauglin*, No. 1:20-cv-02028-CNS-GPG, 2022 WL 4388399, at *3 (D. Colo. Sept. 22, 2022). "[T]he question is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by [the healthcare contractor]'s policy, but whether [the contractor] had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable because [the contractor] stepped into the County's shoes with the County's permission." *Est. of Walter v. Corr. Healthcare Cos.*, 323 F. Supp. 3d 1199, 1215-16 (D. Colo. 2018). To establish liability against a public entity under the non-delegable duty doctrine, a plaintiff must present evidence that the third party satisfies the three *Monell* requirements: that the third party promulgated a policy or custom, that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional right, and that the third party enacted or maintained the policy with "deliberate indifference to an almost inevitable constitutional injury." *See Est. of Lovern by & through Dailey v. Correct Care Sols., LLC*, No. 18-CV-02573-KLM, 2019 WL 2903589, at *7 (D. Colo. July 3, 2019); *Schneider*, 717

45

F.3d at 769. If a plaintiff satisfies all three requirements, the public entity may be liable because the third party's policies are considered to have become the public entity's policies. *See Est. of Walter*, 323 F. Supp. at 1216.

First, the Court rejects the Jefferson County Defendants' argument that the non-delegable duty theory is impermissible vicarious liability and so should not apply, consistent with prior decisions from courts in this District. *See, e.g., Rogacki,* 2022 WL 16551336; *McGill*, 2014 WL 5423271; *Est. of Lovern*, 2019 WL 2903589, at *3–4 (collecting cases).

Plaintiffs allege that the "Jefferson County Defendants intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, Wellpath," and that the county contracted with Wellpath to provide medical care at the JCDF. ECF No. 47, ¶ 232. The Jefferson County Defendants claim that Plaintiffs did not allege that the Sheriff allowed Wellpath to make final decisions regarding the Sherrif's policies and so the Wellpath policies cannot be imputed to the Sheriff. However, as the *Lovern* court observed, consistent with the Supreme Court's ruling in *West v. Atkins*, 487 U.S. 42, 56 (1988), "the government's obligation to provide adequate medical care is non-delegable," *Lovern*, 2019 WL 2903589, at *3. Alleging that Jefferson County contracted with Wellpath to provide medical care at the JCDF is sufficient to establish that Jefferson County may be held liable for Wellpath's policies and customs relating to this provision of medical care.

iii.     *Tort Claims*

Plaintiffs bring three state law tort claims—medical negligence, negligent training and supervision, and wrongful death—against the Jefferson County Defendants. The Jefferson County Defendants challenge those claims as barred by the Colorado Governmental Immunity Act and the applicable statute of limitations. The Court addresses each argument in turn, ultimately dismissing these claims as untimely.

a.  *Colorado Governmental Immunity Act*

The Jefferson County Defendants argue that Ms. Angelo was a convicted inmate, and so the Colorado Governmental Immunity Act (CGIA) bars Plaintiffs' state law claims. Although Colo. Rev. Stat. § 24-10-106(1)(b) waives sovereign immunity for injuries arising from the operation of a jail, the waiver does not apply "to claimants who have been convicted of a crime and incarcerated in a correctional facility or jail pursuant to such conviction." C.R.S. § 24-10-106(1.5)(a). As analyzed above, Ms. Angelo was a pretrial detainee at the time of the challenged actions, so the CGIA does not bar her state law claims.

b.  *Statute of Limitations*

The Jefferson County Defendants argue that Colo. Rev. Stat. § 13-80-103(1)(c) bars Plaintiffs' state law claims against the sheriff because it provides a one-year statute of limitations "regardless of the theory upon which suit is brought, or against whom suit is brought, [for a]ll actions against sheriffs." *Id.*; *see Estate of Burgaz v. Shrader*, 21CA1648, 2022 WL 17716479, at *4 (Colo. App. Dec. 15, 2022) (unpublished opinion). However, the question is whether § 103(1)(c) applies to sheriffs in their official capacity; Plaintiffs

47

argue that it does not, and so the two-year statute of limitations in § 13-80-102, which applies to public entities, should apply. *See Dodge v. Padilla*, 537 P.3d 409, 412 (Colo. App. 2023) ("Although a public official is a named person, official capacity suits are generally treated as suits against the entity that the person represents."); *Porro*, 624 F.3d at 1328 ("Suing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent."). Plaintiffs allege that naming Sheriff Marinelli in her official capacity is the proper way of bringing suit against the Sheriff's Office, and so is the equivalent of naming a governmental entity.

However, courts in this jurisdiction have interpreted the plain language of § 103 to apply the one-year statute of limitations to sheriffs and other law enforcement officers, even when sued in their official capacities. *See Garrett v. Bd. of Cnty. Comm'rs of Cnty. of Fremont*, No. 1:18-cv-02968-DDD-STV, 2019 WL 3397085 (D. Colo. Aug. 23, 2019) (unpublished opinion); *Kartiganer v. Newman*, No. 09-cv-00050-WYD-MEH, 2010 WL 3779303, at *9 (D. Colo. Aug. 30, 2010) (unpublished opinion), aff'd, 450 F. App'x 713 (10th Cir. 2011); *Estate of Burgaz v. Shrader*, 2021CA1648 (Colo. App. Dec. 15, 2022) (unpublished opinion) (holding that § 103 applies to sheriffs, even those sued in their official capacity); *Garcia v. Harms*, 410 P.3d 561 (Colo. App. 2014) (holding that claims against law enforcement officers in their official capacities are subject to § 103). The one-year statute of limitations applies to "[a]ll actions against sheriffs" and "any other law enforcement authority." Colo. Rev. Stat. § 13-80-103(1)(c). The Court agrees with these

decisions that the plain language of § 103 indicates that it applies to sheriffs, even in their official capacities.

Plaintiffs filed their complaint on June 23, 2023, which is almost two years after Ms. Angelo's death. The one-year statute of limitations makes these claims untimely. The Court therefore dismisses the state law claims against the Jefferson County Defendants.

## IV.  CONCLUSION

Consistent with the above analysis, the Wellpath Defendants' Motion to Dismiss, ECF No. 54, is DENIED as to Wellpath and each of the individual Defendants. The Jefferson County Defendants' Motion to Dismiss, ECF No. 62, is GRANTED in part and DENIED in part. The claims against the Board of County Commissioners and the state law tort claims against Sheriff Marinelli are dismissed.

DATED this 20th day of May 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge